FILED

2018 OCT -1  AM II: 20

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MYRIA PETROU,

V                                                    COMPLAINT

Ann Arbor Observer,                    CV18-08437-CBM(KSx)

Defendant.

MYRIA PETROU (in Pro Per)

820 E. Foothill Blvd, Unit A

Monrovia, CA 91016

Phone: (626) 272-7393

petroumyria75@gmail.com



PAID

OCT - 1 2018

Clerk, US District Court
COURT 4612

TRIAL BY JURY DEMANDED

COMPLAINT

NOW COMES Myria Petrou and for her complaint who states as follows:

## I. JURISDICTION AND VENUE

1.   Plaintiff Dr. Myria Petrou is a resident of the City of Monrovia, County of Los
     Angeles, State of California.

2.   Defendant Ann Arbor Observer was at all times relevant, a Michigan corporation
     with a business address of 2390 Winewood, Ann Arbor, MI 48103 in the County of
     Washtenaw, State of Michigan.

3.   Jurisdiction is conferred by 28 USC § 1332 given diversity of state citizenship and
     amount in controversy exceeding $75,000.

4.   Jurisdiction and venue are proper in this court.

1

## II.  THE PARTIES

5.  Plaintiff Dr. Petrou realleges and incorporates all proceeding paragraphs by reference as if more fully set out herein.

6.  Dr. Myria Petrou is a board certified neuroradiologist who has worked as faculty for over 10 years in academic institutions including Johns Hopkins University and the University of Michigan.  Dr. Petrou was born in Cyprus, attending the English School in Nicosia and graduated from college and medical school from the University of Cambridge, U.K under a Commonwealth Scholarship.  Dr. Petrou is considered a nationally recognized expert in the field of imaging of neurodegenerative and dementing diseases and has secured over a million US dollars in extramural research funding for her research.  Dr. Petrou is married to Dr. Bradley Foerster and has two children, Maria Eva Foerster age 10 and Peter Martin Foerster age 9.

7.  The Ann Arbor Observer is magazine published monthly and has a circulation of 60,000 reaching all permanent residents of Ann Arbor and all Washtenaw County Chamber of Commerce members.  In addition, there is an online version of the Ann Arbor Observer with an internet address of annarborobserver.com.

## III.  STATEMENT OF FACTS

8.  Plaintiff Dr. Petrou sues for harm and thus damages nationwide and internationally to herself as an individual; damages include direct financial harm to her, harm to her professional reputation and harm to her professional opportunities as an individual, with these damages collectively reaching the multimillion dollar range.

9.  Plaintiff Dr. Petrou sues for harm to her financial interests as an individual owner of properties and assets impacted by these events, which has resulted in financial harm to Plaintiff Dr. Petrou as an individual through the loss of value of her ownership interests in those properties and assets as a result of Defendants' defamation and other tortious conduct.

10.  In fact, Plaintiff Dr. Petrou recently resigned from her faculty appointment at the University of Michigan effective 9/30/2018 in part based on the defamatory statements published by Defendant Ann Arbor Observer. Plaintiff's husband, Dr.

2

Bradley Foerster, also a target of the defamatory statements by the Ann Arbor Observer has been reprimanded and subjected to a psychiatric examination (which Dr. Foerster passed) by the University of Michigan based in large part on the published defamatory articles.

11. Specifically, Dr. Eva Feldman, Professor of Neurology University of Michigan, informed Plaintiff and Dr. Bradley Foerster on 6/26/2018 that the University decided that a psychiatric evaluation was warranted based on the articles published by the Ann Arbor Observer.

12. Specifically, Dr. Foerster was recently questioned by University of Michigan Psychiatrist Dr. Kirk Brower during a second, follow up, visit for this psychiatric evaluation regarding him and his wife (i.e. Plaintiff) "being held in contempt by the court" over the cat ownership case published by Defendant Ann Arbor Observer.

13. Dr. Brower also inquired how Dr. Foerster felt about filing so many complaints, along with his spouse (i.e. Plaintiff Dr. Myria Petrou), and always being "wrong". Dr. Marschall Runge, Dean and Executive Vice President of Medical Affairs at the University of Michigan in written communications to Dr. Foerster dated 8/15/2018 and 9/7/2018 stated that the media articles outlining these court cases (referring to the Ann Arbor Observer articles) highlighted his employment at the University of Michigan and could potentially reflect negatively upon the University.

14. In the January 2018 issue, the Ann Arbor Observer published an article titled "The Battle of Geddes Ridge" by author Michael Betzold.  The article was also published concurrently online on the Ann Arbor Observer website and readily appears on internet search engines when Plaintiff Dr. Petrou's name is searched.

15. A complete copy of the article "The Battle of Geddes Ridge" is attached as **Exhibit A**.

16. In spite of the title of the article referencing Plaintiff Dr. Petrou's fight to prevent eviction from her house, the article references many other facets of Plaintiff Dr. Petrou's life including her employer at the time, the University of Michigan, which are not necessary to the theme or message of the article.

17. In the April 2018 issue, the Ann Arbor Observer published an article titled "Cat Fight" by author Michael Betzold.  The article was also published concurrently

3

online on the Ann Arbor Observer website and readily appears on internet search engines when Plaintiff Dr. Petrou's name is searched.

18.  A complete copy of the article "Cat Fight" is attached as **Exhibit B**.

19.  In the June 2018 issue, the Ann Arbor Observer published an article titled "Losing Geddes Ridge" by author Michael Betzold.   The article was also published concurrently online on the Ann Arbor Observer website and readily appears on internet search engines when Plaintiff Dr. Petrou's name is searched.

20.  A complete copy of the article "Losing Geddes Ridge" is attached as **Exhibit C**.

21.  Specifically, when "Myria Petrou" is searched using the mobile Google search engine, the articles "The Battle of Geddes Ridge" and Cat Fight" appear as items #2 and #3 after Dr. Petrou's professional standing at the University of Michigan posting.

22.  Plaintiff Dr. Petrou never provided input or commentary for the article either herself, through her spouse Bradley Foerster, or through another authorized third party.

23.  Plaintiff Dr. Petrou emailed, faxed and certified mailed a letter asking for retraction of the three published articles to the Ann Arbor Observer on August 27, 2018 given their defamatory nature providing details regarding the false statements and misrepresentations included in the article.

24.  The letter asking for retraction of these articles dated August 27 2018 is attached as **Exhibit D**.

25.  From August 27 2018 to September 2, 2018 Plaintiff Dr. Petrou emailed Editor John Hilton and Reporter Michael Betzold two additional times to demand retraction of the three published articles.

26.  The emails from Plaintiff Dr. Petrou to Editor John Hilton and Reporter Michael Betzold are attached as **Exhibit E**.

27.  Plaintiff Dr. Petrou sent a cease and desist letter to the Ann Arbor Observer on September 26 2016.

28.  The cease and desist letter is attached as **Exhibit F**.

29.  On September 28 2018, Brian Watson, legal counsel for the Ann Arbor Observer emailed Plaintiff Dr. Petrou and refused to retract the false information published in

the three articles and issue a public apology.

30. Further, Brian Watson wrote that Reporter Michael Betzold and the Ann Arbor Observer are planning to publish a follow-up article on Dr. Petrou and her husband Dr. Bradley Foerster.

31. The email from Brian Watson is attached as **Exhibit G.**

32. The three defamatory articles are still available and accessible on the Ann Arbor Observer website.

33. Upon information and belief, the follow-up article planned by the Ann Arbor Observer will continue to publish false and untrue statements about Plaintiff Dr. Petrou in an effort to defame and discredit her.

34. Defendant Ann Arbor Observer has misrepresented the truthful story of these events by faulting the Plaintiff and by ignoring and/or not reporting accurately and inclusively on the available evidence and thus defaming Plaintiff Dr. Petrou.

35. Defendant's defamation of Plaintiff Dr. Petrou is false and malicious, including to but not limited to the fact that Defendant Ann Arbor Observer's sources would bear the blame and legal consequences if they did not portray Plaintiff Dr. Petrou at fault.

36. In the alternative, Defendant Ann Arbor Observer manufactured the alleged facts pled in this complaint.

37. Actual malice can be found if the Defendant published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

38. Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

39. Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

40. The thesis of Defendant Ann Arbor Observers' defamatory articles are that Plaintiff Dr. Petrou files untrue and false statements to: 1) the courts, 2) law enforcement which includes the FBI and by association would therefore be a felonious act, 3) other governmental officials, and 4) others. Further, the Ann Arbor Observer advances the false narrative that Plaintiff Dr. Petrou steals neighbor's cats and refuses to return them, defrauds builders and attorneys, extorts her colleagues, terrorizes witnesses, forges signatures on court documents, and embezzles her mother's retirement funds.

41. Defendant Ann Arbor Observer sets out to discredit Plaintiff Dr. Petrou who is a material witness to independent party witness testimony regarding a Russian money laundering operation in the state of Michigan as well as the subversion of the 2016 U.S. Presidential Election.

42. That is, Defendant Ann Arbor Observers articles are not neutral reports, in which errors could be classified as simply inadvertent. The articles are intentional, politically- driven, falsified, and misleading attacks on Plaintiff Dr. Petrou.

43. Defendant Ann Arbor Observer ignored evidence that should have warned Defendant that their false and misleading publications are wrong even after being reminded of the availability of this evidence by Plaintiff Dr. Petrou.

44. Defendant Ann Arbor Observer selectively referenced Plaintiff Dr. Petrou's blog "GoosiLeaks", takes many items out of context and ignores extensive evidence available on the blog including conversation recordings in order to defame Plaintiff Dr. Petrou.

45. Defendant's defamation that Plaintiff Dr. Petrou defrauded builder, Christopher Laycock ("Laycock" hereafter), is false and misleading including but not limited to the fact that Judge Archie Brown (Washtenaw County Circuit Court Case No.: 17-154-CB) specifically stated in his opinion issued on June 19 2017 that the Plaintiff Dr. Petrou did not defraud Laycock.

46. This act of defamation imputes that Plaintiff Dr. Petrou defrauded Laycock which would constitute a criminal offense.

47. Defendant's defamation that Plaintiff Dr. Petrou accused Laycock of bank fraud is false and misleading including but not limited to the fact Laycock *admitted* to the

bank fraud in his sworn affidavit filed for Washtenaw County Circuit Court Case No.: 17-154-CB and attempted to exonerate himself from the fraud by falsely stating that Plaintiff Dr. Petrou and her spouse prepared and controlled the sworn statements, a statement which he went on to contradict in his sworn deposition on October 24 2017. Again, the court opinion which if quoted paints the Plaintiff Dr. Petrou in a much more positive light, was publicly available at the time of article publication yet NOT quoted in the article.

48. This act of defamation imputes that Plaintiff Dr. Petrou is making a false criminal allegation against Laycock which would constitute a criminal offense.

49. Defendant's defamation that Laycock is suing to collect liens for $274K in unpaid work is false and misleading including but not limited to the fact that at the time of publication there was a decision by Judge Archie Brown from July 21 2017 to set a bond for the liens for only $79K which is NOT referenced in the article.

50. In addition, Defendant ignored the fact that Laycock signed a final sworn statement under oath on November 29, 2016 that balance to complete was only $36K.  By suing to foreclose on liens in excess of $36K, Laycock was in fact declaring that he committed bank fraud. This fact was clearly stated multiple times on Plaintiff Dr. Petrou's blog which was publicly available at the time of the article publication and selectively referenced by the article but this critical fact is NOT mentioned in the Ann Arbor Observer article(s).

51. Defendant's publication   that Plaintiff Dr. Petrou wrongly claimed that her constitutional rights were violated for having her bank accounts frozen due to hundreds of thousands of dollars missing from Plaintiff Dr. Petrou's mother's investment accounts is false and misleading including but not limited to the fact that the search and seizures were issued without probable cause as Plaintiff Dr. Petrou had a broad reaching durable power of attorney and that Myria's mother Maria Petrou instructed Plaintiff Dr. Petrou to remove the funds to repay Plaintiff Dr. Petrou's expenditures that had been made for Plaintiff Dr. Petrou's parents.

52. Further Defendant publishes: "According to an affidavit by AAPD detective Brad Rougeau, in November 2016 Myria Petrou emptied her parents' Merrill Lynch investment account, transferring nearly $234,000 to her own PNC account. In her

counter-complaint, Maria Petrou charges that her daughter and son-in-law 'unlawfully' took her and her husband's funds 'for their own use including additions to an expensive new residence.'"

53. This act of defamation imputes that Plaintiff Dr. Petrou embezzled Maria Petrou's money which would constitute a criminal offense.

54. Defendant's defamation that Plaintiff Dr. Petrou caused Laycock's wife's unfortunate suicide in July 2015 due to "a dispute with the doctors over payment for his construction work." Laycock never brought up any concerns that the finances contributed to his wife's suicide. In fact, in an email to Dr. Bradley Foerster and architect Theresa Angelini on August 13 2015 regarding the fact that Plaintiff and Dr. Bradley Foerster were sorting out the construction financing with the bank Laycock stated: "Thanks Brad, no worries. Happy we are moving along. The only bad news is that you won't be moving in for Christmas......:)".

55. This act of defamation imputes that Plaintiff Dr. Petrou was responsible for Laycock's wife's suicide which would constitute a criminal offense.

56. Defendant's defamation that Plaintiff Dr. Petrou claims that Maria Petrou went to the police to force Plaintiff Dr. Petrou back into a relationship is false and misleading including but not limited to the fact phone conversation recordings posted on the blog "GoosiLeaks" between Maria Petrou and friend, Duaa Altaee, have Maria Petrou telling Duaa Altaee, unprompted, that Maria had no choice but to go to the police to get her daughter back.

57. In addition, these recordings show that Maria Petrou made false criminal accusations to the Ann Arbor police, a fact that is ignored by the Ann Arbor Observer.

58. Defendant's defamation that Plaintiff Dr. Petrou files "frivolous", inappropriate and nuisance lawsuits and complaints out of "malice" and to terrorize innocent parties is false and misleading including but not limited to the fact that the complaints lawsuits were filed to defend Plaintiff Dr. Petrou's constitutional rights.

59. Defendant's defamation that Plaintiff Dr. Petrou's house is a "10,000-square-foot dream house" is false and misleading when in fact the house is a 6417-square-foot house.

60. Defendant's defamation that Plaintiff Dr. Petrou's house construction from the first builder, Ken Trevor, sank midstream due to an unrealistic budget is false and misleading including but not limited to the fact the first builder was replaced with Laycock upon recommendation of architect Theresa Angelini due to severe delays in house construction.

61. Defendant's defamation that Plaintiff Dr. Petrou's house build stood half finished for more than a year with a basement filled with debris and animals and walls three inches out of plumb is false and misleading including but not limited to the fact that Laycock commenced worked on the house less than two months after the first builder left the project, the basement was not filled with debris or animals and only the staircase wall was out of plumb.

62. Defendant's defamation that Plaintiff Dr. Petrou failed to make a promised initial payment and didn't keep up with mounting costs and upgrades is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou and her spouse made $75K payments out her own pocket to Laycock while bank financing was secured, that Laycock was fully aware and understanding of the delay in bank financing, and that payments were made against change orders to keep up with costs, that Plaintiff Dr. Petrou repeatedly and continually asked about pending change orders/needed payments, and that upgrades were included in the final budget and specifications.

63. Defendant's defamation that Plaintiff Dr. Petrou assured Laycock that the new bank loan gave them the needed funds to finish the work is false and misleading including but not limited to the fact that Laycock assured Plaintiff Dr. Petrou that the work could be completed based on the amount of the revised loan amount in Laycock's email to the Bank of Ann Arbor dated August 24, 2017 (documented in Judge Archie Brown's decision from June 19 2017 as well on "GoosiLeaks", both of which were available at the time of article publication): "We can finish the project with reductions for the amount of the loan.", "Essentially Brad, Theresa, and Myria gave me the new build budget to work with. This is ok with me and I am confident we can get the into their new house with the reduced scope…"

64. Defendant's defamation that there was a failed attempt by Father Nicolaos Kotsis to

have Plaintiff Dr. Petrou's children to see their grandfather for his birthday is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou initiated and approached Father Kotsis to arrange for a meeting however Maria Petrou declined the proposed date of the meeting. Once again this information was clearly documented in the blog "GoosiLeaks" but mischaracterized by the Ann Arbor Observer to created a false and misleading narrative against Plaintiff Dr. Petrou.

65.  Defendant's defamation that Plaintiff Dr. Petrou misled Maria Petrou into signing a durable power of attorney which she and her husband did not understand is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou arranged and set-up the investment funds at Merrill Lynch in 2013 upon direction of Maria and Petros Petrou and that Plaintiff Dr. Petrou reviewed and explained the durable power of attorney both Maria and Petros Petrou both of which voiced understanding of the durable power of attorney and signed of their own free will in the presence of Bradley Foerster, Plaintiff Dr. Petrou's husband. Following, Myria Petrou made numerous transactions on behalf and with the full knowledge of Maria Petrou.

66.  Defendant's defamation that Plaintiff Dr. Petrou emptied her parent's Merrill Lynch investment account, transferred $234K to her own PNC account, and "unlawfully" took the funds "for their own use including additions to an expensive new residence" is false and misleading including but not limited to the fact that Maria Petrou instructed Plaintiff Dr. Petrou and her husband numerous times to close the Merrill Lynch account, pay Plaintiff Dr. Petrou back for the extensive expenses Plaintiff Dr. Petrou had paid out her own pocket towards her parents, as well as the fact the funds did not get spent on the new residence.

67.  Defendant's defamation that Plaintiff Dr. Petrou was "blaming her mother's 'false testimony' for keeping the children from her grandparents" is false and misleading including but not limited to the fact that Maria Petrou in her recorded phone conversations admitted to false criminal accusations against Plaintiff Dr. Petrou in an effort to gain access to the children.

68.  Defendants defamation that Plaintiff Dr. Petrou has written to many U.S. Senators and local doctors and complained to Governor Rick Snyder and Attorney General

10

Bill Schuette about "police corruption" and a "conspiracy" against them as well as local officials is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou was not filing assertions or complaining but simply presenting facts and asking for an investigation. Attorney Cyril Hall who has litigated nationally repeatedly stated that he has NEVER seen two physicians with no criminal record face such inexplicable challenges and difficulties with law enforcement.

69. Defendant's defamation that Plaintiff Dr. Petrou told the FBI that she "believes" that Laycock committed bank fraud is false and misleading including but not limited to the fact that the Plaintiff Dr. Petrou told the FBI that Laycock *admitted* to bank fraud in the court complaint that he filed (Washtenaw County Circuit Court Case No.: 17-154-CB).

70. This act of defamation imputes that Plaintiff Dr. Petrou was making false statements to the FBI which would constitute a criminal offense.

71. Defendant's defamation that Plaintiff Dr. Petrou repeatedly involves her children in her dispute is false and misleading including but not limited to the fact that the Plaintiff Dr. Petrou protects her children including against her mother who has acted bizarrely and in a threatening manner against Plaintiff Dr. Petrou's children and their interests. Plaintiff Dr. Petrou has received numerous voicemails from her mother Maria Petrou in which erratic behavior, malignant intent and extortion towards Plaintiff Dr. Petrou and her family are clearly demonstrated.

72. Defendant's defamation regarding Plaintiff Dr. Petrou's affidavit regarding that she never abused her children or had extramarital sex as well as a fabricated sex scandal that the Defendant alludes to a "complicated relationship" with Dr. Paul Cronin is false and misleading including but not limited to the fact that the affidavit was executed in response to a email between a character "Nick B" who claims to be faculty at the University of Michigan Department of Radiology (and later "identified" by Dr. Paul Cronin as being Dr. Nicholas Burris, faculty within the division of cardiothoracic radiology at the University of Michigan) and Laycock's attorney Marian Faupel (heavily quoted by Ann Arbor Observer).

73. Defendant's defamation that Plaintiff Dr. Petrou has "also been involved in

controversy at the Michigan Medicine" based on being a witness to Ms. Duaa Altaee's (NIH R01 grant research coordinator) sexual harassment and Plaintiff Dr. Petrou accused Dr. Robert Welsh of receiving NIH money for work not performed is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou followed all appropriate reporting University and Federal guidelines regarding the reporting of sexual harassment and concerns regarding the NIH funds.

74. This act of defamation imputes that Plaintiff Dr. Petrou was making false criminal allegations regarding misuse of federal funds which would constitute a criminal offense.

75. Defendant's defamation that Plaintiff Dr. Petrou attempted to obtain a restraining order against the Markels over a cat ownership case involving two cats is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou never pursued a restraining order but asked Cyril Hall, her attorney, to specifically ask the Markels to stop showing up unannounced at the door late at night and leaving odd messages which was distressing to Plaintiff Dr. Petrou's children.

76. Defendant's defamation that Plaintiff Dr. Petrou refused to return the cats to Ann Arbor Police is false and misleading including but not limited to the fact that Ann Arbor Police agreed with Plaintiff Dr. Petrou that the matter a civil litigation issue and NOT a criminal issue and should be settled within the court system.

77. Defendant's defamation that Plaintiff Dr. Petrou intentionally brought the wrong cats in March 2018 to the humane society is false and misleading including but not limited to that Plaintiff Dr. Petrou's children collected the cats accompanied by Plaintiff Dr. Petrou's husband who at the time was recovering from spinal fusion surgery and was on heavy pain medication as prescribed by his physician.

78. Defendant's defamation that prosecutors dropped the charges around the same time as the cat issue in mid-March 2018 is false and misleading as the prosecutor stated in his final opinion that no charges were warranted/appropriate on February 7 2018 as according to the prosecutor, who had the case under review since July 2017: "Pending civil litigation is ongoing and this matter is clearly civil and does not rise to level of criminal culpability."

79. Defendant's defamation by failing to report that the Ann Arbor Police initiated a

criminal investigation the same day, February 7 2017, regarding the cats on the same day the prosecutor dropped Maria Petrou's embezzlement case when cat ownership/possession is clearly not a criminal matter.

80. Defendant's defamation that Judge Cox, U.S. Federal Court Judge concluded that "someone had 'sought to deceive'" the court regarding a forged signature on a federal court complaint is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou denied in front of Judge Cox that she forged a signature and that Judge Cox in his final written comments concluded "the Court does not believe that they sought to deceive it" and "the Court cannot conclude that they acted in bad faith".

81. Defendant's defamation that Judge Cox warned Plaintiff Dr. Petrou that failure to appear for a hearing would result in Plaintiff Dr. Petrou being held in contempt is false and misleading including but not limited to the fact that Plaintiff Dr. Petrou attended the April 2018 hearing and was not held in contempt or sanctioned by Judge Cox.

82. Defendant's defamation that Plaintiff Dr. Petrou has sued and accused dozens of defendants who they claim conspired to drive them from their home including the Ann Arbor Observer is false and misleading including to but not limited to the extensive evidence including recordings that were posted on "GoosiLeaks" blog clearly substantiating Plaintiff Dr. Petrou's allegations for the court complaints but ignored by the Ann Arbor Observer. Furthermore, the RICO case was dismissed without prejudice and not on the basis of frivolous claims as the article tries to insinuate.

83. Defendant's defamation that "at least the cats emerged unscathed" is false and misleading including to but not limited to fact that the Plaintiff Dr. Petrou adopted what appeared to be two stray cats in the summer of 2017. Plaintiff Dr. Petrou and her family asked in the neighborhood to find out if the cats did not belong to anyone else and received no information. Plaintiff Dr. Petrou and her family took the cats to the vet to look for a microchip and no microchip was detected during these visits; Plaintiff Dr. Petrou's vet visit documents were shared with the court during the hearing, the transcript for which was readily available and yet none of these

statements which would paint Plaintiff Dr. Petrou in a much different and positive light are mentioned in the article. Furthermore, Plaintiff Dr. Petrou took excellent care of the cats, immunized the cats and provided the cats a loving home.

84. Defendant's defamation that Judge Carol Kuhnke, Washtenaw County Circuit Court, has ruled multiple times against the Plaintiff Dr. Petrou including sanctions is false and misleading including to but not limited to fact that Defendant omitted any discussion of potential conflicts of interest of Judge Kuhnke with regards to cases involving local law enforcement. Judge Kuhnke was investigated for wrongful death of her son John Kuhnke by local law enforcement, there were articles in the press referencing this investigation and questioning conflicts of interest between the judge and law enforcement and the police and prosecutor files regarding this matter were readily available through FOIA.

85. Defendant's defamation that Plaintiff Dr. Petrou and her husband continue to file spurious complaints and letters including a letter regarding "election meddling— and a racketeering network" that the Defendant claims was provided anonymously is false and misleading including but not limited to the fact that two letters were deposited at the Washtenaw County Court System, one to Special Counsel Mueller and one to the Democratic National Committee and therefore were publically available (**Exhibit H**).   Furthermore the Defendant fails to report that the letters document the fact that Plaintiff Dr. Petrou offers to provide testimony under oath regarding detailed descriptions of a Russian money laundering operation and interference with the 2016 U.S. Presidential election *provided by a witness*, as well as *extensive audio recordings from witnesses* documenting these accounts, and that Plaintiff Dr. Petrou has already reported these concerns to the FBI, with the full understanding what providing false testimony to the FBI entails.

86. Defendant's defamation questioning the legitimacy of the Plaintiff Dr. Petrou's statements in the "letter" is false and misleading including but not limited to the fact that the letters to Special Counsel Mueller and to the Democratic National Committee document that these statements were made to the FBI.

87. The Defendant's defamation is further proven out by the lack of response by the Defendant to the Plaintiff Dr. Petrou's letter dated August 27, 2017 (**Exhibit D**):

"The wording of your statement is puzzling for if the testimony is legitimate (which it is) then we do not 'see ourselves' as part of an international conspiracy; we would de facto be part of such a process. And can we ask if you have considered why two physicians with no past criminal history and no significant conflicts find themselves in such an inexplicable situation?"

88. Defendants' acts were willful malicious, deliberate, or were done with reckless indifference and disregard to the truth or likelihood that such behavior would cause severe damages to Plaintiff Dr. Petrou and with utter disregard for the consequences of such actions.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Common Law Defamation "Per Se"*

89. Plaintiff Dr. Petrou realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

90. The Defendant has defamed the Plaintiff Dr. Petrou by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff Dr. Petrou, which the Defendant knew or should have known to be false.

91. The Defendant knew that Defendant's public statements about the Plaintiff Dr. Petrou would cause severe damage to the reputation, business opportunities, social relationships and the career of Plaintiff Dr. Petrou.

92. A statement is per se defamatory if it false imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of her lawful business, trade profession or office; in other words, or if it tended to injure Plaintiff Dr. Petrou in her trade or profession.

93. A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

94. For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953).

95. **First, in Paragraph 4 of the article "<u>The Battle of Geddes Ridge</u>", the Defendant published as Libel** *Per Se*:

"In their blog and in court, Foerster and Petrou claim that the builder of their dream home, Christopher Laycock, committed bank fraud. Laycock says the couple defrauded him".

96. **Second, in Paragraphs 8 and 20 of the article "<u>The Battle of Geddes Ridge</u>", the Defendant published as Libel** *Per Se*:

"In court Faupel fired back, blaming Laycock's wife's suicide on stress his business suffered from the dispute with the doctors over payment for his construction work." "Renee Laycock took her own life July 7, 2015. Once an accountant for Faupel's law firm, she also kept the books for her husband's construction business. In his lawsuit, Laycock writes that his wife "died on the day a significant payment from Foerster and Petrou was due." According to Faupel, the money would have covered $200,000 owed to suppliers and subcontractors. Faupel says her former employee had been struggling with mental health issues and that the shock of learning the payment was not coming 'helped push Renee over the top."

97. **Third, in Paragraph 25 of the article "<u>The Battle of Geddes Ridge</u>", the Defendant published as Libel** *Per Se*:

"According to an affidavit by AAPD detective Brad Rougeau, in November 2016 Myria Petrou emptied her parents' Merrill Lynch investment account, transferring nearly $234,000 to her own PNC account. In her counter-complaint, Maria Petrou charges that her daughter and son-in-law 'unlawfully' took her and her husband's funds 'for their own use including additions to an expensive new residence.'"

98. **Fourth, in Paragraph 33 of the article "<u>The Battle of Geddes Ridge</u>", the Defendant published as Libel** *Per Se*:

"They told the FBI that they believe Laycock committed bank fraud."

99. **Fifth, in Paragraph 57 of the article "The Battle of Geddes Ridge", the Defendant published as Libel *Per Se*:**

"Foerster and Petrou also accuse Welsh of defrauding the NIH."

## SECOND CAUSE OF ACTION
### *Common Law General Defamation*

100. Plaintiff Dr. Petrou repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

101. The Defendant has defamed Plaintiff Dr. Petrou by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff Dr. Petrou which Defendant knew or should have known to be false or misleading.

102. To establish General Defamation, a Plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

103. Pleading in the alternative to the First Cause of Action, Plaintiff Dr. Petrou re-alleges each of the statements alleged under the First Cause of Action, supra, as Defamation Per Se, and here alleges that each of those statements are also General Defamation.

104. Plaintiff Dr. Petrou thus claims here that if the Court finds that any of the statements labeled "First" through "Fifth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff Dr. Petrou claims here that any and all such statements not qualifying as Defamation Per Se constitute General Defamation against the Plaintiff Dr. Petrou.

105. Plaintiff Dr. Petrou therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Fifth" above.

106. In addition, Defendant also made other defamatory statements that are also General Defamation

107. **Sixth, in Paragraph 4 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"He's [Laycock's] suing to collect liens for $274,000 in unpaid work. "

108. **Seventh, in Paragraph 5 in the article "The Battle of Geddes Ridge", the**

**Defendant published as General Defamation:**

"they [Myria Petrou and Bradley Foerster] say she [Maria Petrou] went to the police 'to try to force [Petrou] back into a relationship with her.'"

109. **Eighth, in Paragraphs 7, 8, &10 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"They've also filed lawsuits in state and federal courts against Laycock, architect Theresa Angelini, the City of Ann Arbor, two AAPD detectives, and Petrou's mother, Maria Petrou. The suits allege that some or all of the defendants violated the couple's rights under the Fourth, Fifth, and Fourteenth amendments, defamed them, and caused Petrou's miscarriage.

"'I've never seen anyone litigate with as much malice as they have,' says veteran attorney Marian Faupel-- herself the target of one of the professional complaints."

"'Everybody feels sort of terrorized,' Faupel opines."

110. **Ninth, in Paragraph 19 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"they failed to make a promised initial payment and didn't keep up with mounting costs as they added upgrades like white oak flooring and a glass staircase railing."

111. **Tenth, in Paragraph 21 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"according to Laycock's complaint the couple repeatedly assured him the new bank loan gave them the funds needed to finish the work. But by mid-2016, even as the dream house was nearing completion, Laycock and the doctors were deeply at odds over payments and the contract terms."

112. **Eleventh, in Paragraph 21 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"Reach says that Maria Petrou went to the AAPD for help in determining what happened to her money but never asked for criminal charges against the couple."

113. **Twelfth, in Paragraph 49 in the article "The Battle of Geddes Ridge", the Defendant published as General Defamation:**

"He [Judge Archie Brown] has also ruled that Laycock's liens are valid."

114. **Thirteenth, in Paragraph 4 in the article "Cat Fight", the Defendant published**

**as General Defamation:**

"After seeing the photos on the blog, the Markels say they visited, called, and mailed Foerster and Petrou--who responded by trying to get a restraining order against them (it was denied). The Markels called the police, but when an officer went to the doctors' house, they refused to turn over the cats."

### THIRD CAUSE OF ACTION
### *Common Law Defamation By Implication*

115. Plaintiff Dr. Petrou repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

116. The Defendant has defamed Plaintiff Dr. Petrou by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff Dr. Petrou which Defendant knew or should have known to be false or misleading.

117. For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

118. Pleading in the alternative, Plaintiff Dr. Petrou re-alleges that each of the statements alleged under the First and Second Causes of Action, supra, are in the alternative also Defamation by Implication.

119. Plaintiff Dr. Petrou thus alleges here that if the Court finds that any of the statements labeled "First" through "Thirteenth" above do not constitute Defamation Per Se or General Defamation, then in the alternative the Plaintiff Dr. Petrou re-alleges here that any and all such statements not constituting as Defamation Per Se or General Defamation are Defamation by Implication against the Plaintiff Dr. Petrou.

120. Plaintiff Dr. Petrou therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Thirteenth"

above.

121. Across the many examples of libelous statements from the Articles, Defendant published that the Plaintiff Dr. Petrou deceived the Washtenaw County and Federal Court Systems and in addition filed nuisance and frivolous complaints to the court as well as various government agencies and authorities.

122. Thus, Defendant libels Plaintiff Dr. Petrou by implication that she deceived the Washtenaw County and Federal Court Systems and in addition filed nuisance and frivolous complaints to the court as well as various government agencies and authorities.

123. **In the Fourteenth example of Defamation, in Paragraphs 15 & 54 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Their 10,000-square-foot dream house would have four bedrooms, a three-car garage, and a rooftop deck."

"Foerster and Petrou would need to come up with more than $1 million to retain their 10,000-square-foot trophy home."

124. Thus, as Defamation by Implication, Defendant falsely published that that the house was 10,000 square feet when in actual fact it was less than two-thirds that size at 6417 square feet.  The implication here is that Plaintiff Dr. Petrou was attempting to build a house on the cheap and then not "not pay" and "defraud" the builder.

125. **In the Fifteenth example of Defamation, in Paragraph 17 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Their first builder, the lawsuit says, estimated the work could be done for less than $125 per square foot; Laycock said a realistic price would have been $250-$300. Unsurprisingly, the project sank midstream."

126. Thus, as Defamation by Implication, Defendant falsely published that that the estimated construction costs was less than $125 per square foot and that due to an unrealistic construction cost, based on the false published 10,000 square foot size the project sank midstream when in reality the first builder was terminated due to construction delays. The implication here is that Plaintiff Dr. Petrou was attempting to build a house on the cheap and then not "not pay" and "defraud" the builder.

127. **In the Sixteenth example of Defamation, in Paragraph 18 in the article "The**

**Battle of Geddes Ridge"**, the Defendant published:

"According to Faupel the house stood half-finished, with no windows and a temporary roof, for more than a year before the couple hired Laycock, a builder of custom homes based in Saline. The two sides came to disagree strongly on the terms of their contract and the amount in dispute. But according to Laycock's lawsuit, he found the house with a basement filled with debris and animals and the walls three inches out of plumb."

128. Thus, as Defamation by Implication, Defendant falsely published that the house stood half-finished for more than a year, was in disrepair, and we had early disagreements regarding the contract and amount. The implication here is that Plaintiff Dr. Petrou was unreasonable in terms of the contract, the costs and work when in reality Laycock according to a Judge Archie Brown ruling, Laycock "made a business decision".

129. **In the Seventeenth example of Defamation, in Paragraph 23 in the article "The Battle of Geddes Ridge", the Defendant published:**

"A blog post reveals that Fr. Nicolaos Kotsis, the priest at St. Nicolas Greek Orthodox Church, was enlisted as an intermediary in a failed attempt to get the couple's children to see their grandfather on his birthday in October."

130. The Defendant deliberately omits the stated facts in the blog that the Plaintiff Dr. Petrou was the one who contacted Father Kotsis to arrange for the children to visit their grandfather and that Maria Petrou declined the meeting. The Defamation by Implication here through omission is that Plaintiff Dr. Petrou was the one who precluded the meeting which is false.

131. **In the Eighteenth example of Defamation, in Paragraphs 29 & 30 in the article "The Battle of Geddes Ridge", the Defendant published:**

"In their state and federal lawsuits, the couple blames the miscarriage on stress from Rougeau's investigation. By initiating two searches and seizures of their bank assets, they charge, he acted "either intentionally to harm or with gross reckless disregard for ... whether damage or harm would result to Myria Petrou or her unborn child.

The first seizure, authorized by district court magistrate Tamara Garwood based on

Rougeau's affidavit, occurred February 9; the second took place March 13, almost four weeks *after* the miscarriage."

132. Thus, as Defamation by Implication, Defendant falsely published that the Plaintiff Dr. Petrou claims that both search and seizures were responsible for the miscarriage, including the search and seizure executed after the miscarriage, when in reality the wrongful death claim in the court cases only references the first search and seizure. The implication here is that Plaintiff Dr. Petrou was making false claims in state and federal court cases.

133. **In the Nineteenth example of Defamation, in Paragraph 31 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Petrou responded by blaming her mother's 'false testimony' for keeping the children from their grandparents--and directing her lawyer to stop her mother from contacting her. "

134. Thus, as Defamation by Implication, Defendant is implying that the Plaintiff Dr. Petrou is unreasonable and causing hardship against Maria by 'blaming' Maria Petrou's 'false testimony' when in reality Plaintiff Dr. Petrou posted recordings of Maria Petrou admitting to using false criminal accusations to get her family back. Further, Plaintiff's lawyer, Cyril Hall, advised Plaintiff Dr. Petrou to keep the children away from Maria Petrou not the other way around. Cyril Hall also expressed concern that Maria Petrou would falsely accuse Plaintiff Dr. Petrou of abusing and neglecting her father, Petros, if Petros was under Dr. Petrou's supervision for any length of time.

135. **In the Twentieth example of Defamation, in Paragraph 32 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Foerster and Petrou have written to many U.S. senators and local doctors and complained to governor Rick Snyder and attorney general Bill Schuette about 'police corruption' and a 'conspiracy' against them. They've made similar charges to Ann Arbor mayor Christopher Taylor, city councilmembers, and police chief Jim Baird."

136. This is another example of the continuing Defamation by Implication, that the Defendant implies that Plaintiff Dr. Petrou files frivolous complaints which in

22

actuality resulted in subsequent investigations and replies from various parties that Plaintiff Dr. Petrou's concerns were valid. Defendant ignored the extensive substantiating evidence that was posted on the GoosiLeaks blog.

137. **In the Twentieth-first example of Defamation, in Paragraph 33 in the article "The Battle of Geddes Ridge", the Defendant published:**

"They tried to get one local court to take over their case from another. To date, none of those efforts have succeeded."

138. Thus, as Defamation by Implication, Defendant falsely published that the Plaintiff Dr. Petrou attempted to get one court to take over a case from another where in reality the Plaintiff Dr. Petrou's lawyer simply filed a new case for a restraining order under a different judge.  The implication here is that Plaintiff Dr. Petrou was attempting to improperly subvert the court proceeding and process which is simply not true.

139. **In the Twenty-second example of Defamation, in Paragraph 38 in the article "The Battle of Geddes Ridge", the Defendant published:**

"He [Bradley Foerster] also complains that his mother-in-law's proposed witness list includes his children. Yet the couple themselves have repeatedly involved the children in their disputes."

140. Thus, as Defamation by Implication, Defendant falsely published that the Plaintiff Dr. Petrou has repeatedly involved the children in their disputes.  The implication here is that Plaintiff Dr. Petrou is not a good mother and not protecting her children's best interests which is simply not true.

141. **In the Twenty-third example of Defamation, in Paragraph 43 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Then there's a remarkable November post that includes an affidavit from Petrou that she's never abused her children nor had extramarital sex. The Observer could find no record of anyone accusing Petrou of child abuse--unless you count a sarcastic remark in a 2016 email from Laycock. (After assuring the couple that the home's heating and cooling system posed no threat, he made a snarky joke about calling Child Protective Services if they were still worried.) And what the blog calls a "fabricated sex scandal" seems to be a response to a cryptic comment by Rougeau,

the AAPD detective, about the couple's "complicated relationship" with Aine Kelly's husband, Paul Cronin.

142. Thus, as Defamation by Implication, Defendant is implying that the Plaintiff Dr. Petrou is acting guilty by executing an affidavit based on her Attorney Cyril Hall's advice to protect herself against the defamatory email between "Nick B" and Marian Faupel which the Defendant ignored. The Defendant then goes onto ignore the affidavit and publishing Detective Rougeau's statement that Plaintiff Dr. Petrou has a "complicated relationship" with Paul Cronin implying that Plaintiff Dr. Petrou has had a sexual relationship with Paul Cronin and has in effect perjured herself in the affidavit.

143. **In the Twenty-fourth example of Defamation, in Paragraph 43 in the article "The Battle of Geddes Ridge", the Defendant published:**

"If the story weren't already tangled enough, the night before the April court date Laycock reportedly got a series of anonymous phone calls. Faupel, his attorney at the time, says she got one too. During the deposition in June, Faupel played recordings of a man, who claimed to be a work colleague and called himself 'Nick,' claiming Foerster was extorting money from Cronin. In subsequent emails to Faupel, 'Nick' claimed Cronin was drinking a lot, arguing so much that neighbors called police, and selling properties in Ireland to fund his friends' legal battles. In keeping with the soap opera nature of the story, 'Nick' claimed to Faupel another, more intimate reason that Cronin was entangled. The exact accusation is not public, but the doctors alluded to it in the 'fabricated sex scandal' post."

144. The Defendant commits Defamation by Implication by deliberately omitting the legal fact that since "Nick" is anonymous any such comments attributed to "Nick" are hearsay. The Defendant also omits the postings and evidence published by Plaintiff Dr. Petrou on the GoosiLeaks Blog that the police investigation into the Plaintiff Dr. Petrou were perpetuated on the basis of anonymous "Nick" after Maria Petrou dropped her false criminal allegations to the Ann Arbor Police.

145. **In the Twenty-fifth example of Defamation, in Paragraph 50 in the article "The Battle of Geddes Ridge", the Defendant published:**

"The AAPD's report on the embezzlement investigation was in the hands of the

county prosecutor."

146. The Defendant committed Defamation by Implication by omitting the fact that the prosecutor had the case for over 6 months before concluding: "Pending civil litigation is ongoing and this matter is clearly civil and does not rise to level of criminal culpability."   At the time the article was published the investigation had been concluded for over 5 months.  The published statement above clearly provides credibility to the false allegations made by Maria Petrou and subsequent police investigation implying that the case against Plaintiff Dr. Petrou did have credibility when it clearly did not.

147. **In the Twenty-sixth example of Defamation, in Paragraph 52 in the article "The Battle of Geddes Ridge", the Defendant published:**

"Hall later withdrew his motion, but in November attorneys Michael Reynolds and Mark Evans, who were defending the couple against Laycock's original suit, made a similar request. They cited a breakdown in communication--and also a lack of payment. In a December order, Judge Brown approved their request."

148. Thus, as Defamation by Implication, Defendant falsely published that there was a breakdown in communication and lack of payment to attorneys Michael Reynolds and Mark Evans when there was not.  The implication here is that the Plaintiff Dr. Petrou does not pay her bills and is negligent with respect to her professional and personal obligations, which is not true.

149. **In the Twenty-seventh example of Defamation, in Paragraph 55 in the article "The Battle of Geddes Ridge", the Defendant published:**

"While fighting to hold onto their dream house, Bradley Foerster and Myria Petrou have also been involved in controversy at Michigan Medicine."

150. Thus, as Defamation by Implication, Defendant falsely published that Plaintiff Dr. Petrou is involved in controversy at the University of Michigan.  The implication here once again is that Plaintiff Dr. Petrou files false complaints and is a troublemaker and disruptive at work which is simply not true.

151. **In the Twenty-eighth example of Defamation, in Paragraph 59 in the article "The Battle of Geddes Ridge", the Defendant published:**

"In one of the story's many bizarre twists, the couple write in their blog that Altaee

25

will be 'the primary witness in our conspiracy case in the federal court.' They don't explain how a U-M research coordinator might have learned about alleged machinations between their builder, architect, bank, family members, and the Ann Arbor police. But Altaee does have at least one connection to the dream house: after Foerster and Petrou moved out of their former home behind Arborland, Altaee and her husband moved in."

152. Thus, as Defamation by Implication, Defendant falsely published that Defendant has no information regarding Duaa Altaee's involvement in the federal court case. Plaintiff Dr. Petrou's blog provided extensive evidence which once again was ignored by Defendant including the deleterious impact of "Nick" on Duaa Altaee's marriage and the many recorded conversations that Duaa Altaee had with Maria Petrou in which Maria Petrou admitted to making false criminal allegations against Plaintiff Dr. Petrou and that if the Plaintiff Dr. Petrou did not comply with Maria Petrou's wishes, Maria would take Plaintiff Dr. Petrou's house away, destroy Plaintiff Dr. Petrou's career and ruin Plaintiff Dr. Petrou's life. There is also the implication that there was somehow a bizarre arrangement regarding 1745 Brian Court, Ms. Altaee and Dr. Petrou, which is simply not true. Ms. Altaee and her husband at the time Mr. Tarick Seifeddine rented 1745 Brian Court from Dr. Petrou and Dr. Foerster from June 2016 before Tarick Seifeddine purchased the property from Drs. Petrou and Foerster in December 2017.

153. **In the Twenty-ninth example of Defamation in Paragraphs 6 & 7 in the article "Cat Fight", the Defendant published:**

"Judge Joseph Burke ordered the doctors to bring the cats to the Humane Society of Huron Valley for examination. According to the Markels, on February 21, Foerster showed up with a cat, but it wasn't either of the ones pictured on the blog. At a second session on February 26, Petrou arrived with that same cat plus another. According to the court record, HSHV staff read the cats' implanted microchips. One had been chipped at the Toledo Area Humane Society and was registered to Petrou. The second was registered to a man in Columbus.

Abbey Hall of the Toledo humane Society confirms that Petrou adopted a cat there on February 21, the very day her husband first presented it at HSHV. According to

Alexandra Markel, the Columbus man had given up his cat to the humane society there, where it was adopted on February 24--just two days before Petrou presented it at the second HSHV session."

154. Thus, as Defamation by Implication, Defendant falsely published that Plaintiff Dr. Petrou was at the second scanning session on February 26 when in reality Plaintiff Dr. Petrou's husband Bradley Foerster was present and NOT Dr. Petrou.  The implication is that Plaintiff Dr. Petrou was trying to deceive the court by adopting two cats for the purpose of the scanning session when in reality the Plaintiff Dr. Petrou had adopted two cats as her two young children were very upset.  Bradley Foerster had recently undergone a spinal fusion surgery and was on heavy pain medication as prescribed by his physician.  As such, Plaintiff Dr. Petrou's two young children had gathered the cats and mistakenly brought the "incorrect" cats to the scanning sessions.

155. **In the Thirtieth example of Defamation in Paragraphs 8 & 9  in the article "Cat Fight", the Defendant published:**

"And around the same time, the doctors notched a big legal win: prosecutors decided not to press charges over Petrou's transfer of hundreds of thousands of dollars from her parents' investment account to her own bank account.
The couple complained frequently about that financial investigation on GoosiLeaks, but if they're celebrating now, only their friends will know: The blog is now accessible by invitation only."

156. Once again, the Defendant committed Defamation by Implication by omitting the fact that the prosecutor had this case for over 6 months as well as not reporting the conclusion of the prosecutor who in the report stated: "Pending civil litigation is ongoing and this matter is clearly civil and does not rise to level of criminal culpability."   Also through omission, the Defendant defamed the Plaintiff Dr. Petrou by ignoring the fact (documented through evidence on GoosiLeaks) that the police investigation was one-sided, there was no probable cause for the search warrants, and that Maria Petrou's criminal allegations were false.  Further the article reinforces the false narrative that the Plaintiff Dr. Petrou unjustifiably "complains" about law enforcement, which is not true.

157.  **In the Thirty-first example of Defamation in Paragraphs 12, 13 & 14  in the article "Cat Fight", the Defendant published:**

"The complaint included attorney Cyril Hall's law license number and bore the printed signature 'C. Hall.' But Judge Cox had called the hearing to hear Hall's request to withdraw from the case. Under questioning from the judge, Hall said that he hadn't filed the complaint--and that the couple had told him they had filed it themselves. Cox couldn't question Petrou and Foerster directly, because they'd skipped the session.

The judge was not happy. In a subsequent order, he concluded that the complaint 'bears a forged signature'--and added that someone had 'sought to deceive the Court.' Since the complaint was invalid, he wrote, he was throwing out the entire case.

The judge ordered both the doctors and Hall to appear at another hearing on April 5. In boldface type, he warned: 'Myria Petrou and Bradley Foerster are cautioned that failure to appear for this hearing may result in the Court finding them in contempt.'"

158.  The Defendant committed Defamation by Implication by falsely stating that Plaintiff Dr. Petrou "skipped the session" and "failure to appear for this hearing may result in the Court finding them in contempt" and implying Plaintiff Dr. Petrou was not complying with Court orders when in reality Plaintiff Dr. Petrou's attorney Cyril Hall informed Plaintiff Dr. Petrou that she did not need to be present for the first hearing.  Further Defendant committed Defamation by Implication by implying that Plaintiff Dr. Petrou was responsible for the "forged signature" which is false. Defendant committed Defamation by Implication by omitting Judge Cox's written comments that concluded "the Court does not believe that they [Myria Petrou & Bradley Foerster] sought to deceive it" and "the Court cannot conclude that they acted in bad faith".

159.  **In the Thirty-second example of Defamation in Paragraphs 1 & 2 in the article "Losing Geddes Ridge", the Defendant published:**

"Less than three months later, their builder sued to enforce nearly a quarter- million dollars' worth of liens.

The doctors responded with a dizzying array of litigation."

160. The Defendant committed Defamation by Implication by omitting the fact that Laycock by suing to enforce nearly a quarter of million dollar liens was admitting to the fact that he had signed a false final sworn statement stating balance to complete was $36K and was therefore committing bank fraud. Once again, the Defendant advances a false narrative that the Plaintiff files "frivolous", nuisance and inappropriate complaints.

161. **In the Thirty-third example of Defamation in Paragraph 3 in the article "<u>Losing Geddes Ridge</u>", the Defendant published:**
"That federal case was dismissed after the judge concluded that it was filed with a forged signature"

162. Once again, the Defendant committed Defamation by Implication by implying the Plaintiff Dr. Petrou forged the signature and omitting Judge Cox's written comments that concluded "the Court does not believe that they [Myria Petrou & Bradley Foerster] sought to deceive it" and "the Court cannot conclude that they acted in bad faith".

163. **In the Thirty-fourth example of Defamation in Paragraph 5 in the article "<u>Losing Geddes Ridge</u>", the Defendant published:**
"At least the cats emerged unscathed"

164. The Defendant committed Defamation by Implication by implying that the Plaintiff Dr. Petrou was mistreating the cats, not taking care of them properly, or somehow exposing them to risk when in reality Dr. Petrou and her family adopted the cats assumed to be stray, after asking around the neighborhood if they belonged to anyone and confirming that the cats did not have microchips by scanning them by a veterinarian.

165. **In the Thirty-fifth example of Defamation in Paragraphs 3 in the article "<u>Losing Geddes Ridge</u>", the Defendant published:**
"The doctor's own nearly 600-page January lawsuit remains active, but judge Carol Kuhnke has already dismissed eleven defendants. Kuhnke also awarded two of their former lawyers almost $38,000 in sanctions, reflecting their cost to defend themselves against the doctors' 'frivolous' claims."

166. This is another example of the continuing Defamation by Implication, that the Defendant through publishing implying that the Plaintiff Dr. Petrou files "frivolous" complaints and that the Defendant ignored the extensive substantiating evidence that was posted on the GoosiLeaks blog.  Furthermore, the Plaintiff Dr. Petrou committed Defamation by Implication by omitting any discussion of potential conflicts of interest of Judge Kuhnke with regards to cases involving local law enforcement. Judge Kuhnke was investigated for wrongful death of her son John Kuhnke by local law enforcement, there were articles in the press referencing this investigation and the police and prosecutor files regarding this matter were readily available through FOIA.  The Defendant also commits Defamation by Implication by omitting the fact that Judge Kuhnke ignored numerous motions for stay filed by Plaintiff Dr. Petrou during negotiation with the Bank of Ann Arbor and instead dismissed numerous defendants from the lawsuit.

167. **In the Thirty-sixth example of Defamation in Paragraphs 7 & 8 in the article "<u>Losing Geddes Ridge</u>", the Defendant published:**
"But the doctors aren't giving up. The same day they filed the fruitless request for an injunction, they apparently wrote a letter to Robert Mueller, the special counsel investigating Russian interference in the 2016 election. In the letter, a copy of which was provided to the Observer anonymously, they claim to have information about election meddling--and a racketeering network that launders Russian money in Cyprus.

*If the letter is legitimate, Petrou and Foerster now see themselves as victims of a global conspiracy. It says they are 'huge targets for this racketeering network,' and 'are constantly battling fabricated criminal allegations aimed to discredit us as well as significant adversities in all aspects of our lives.'"*

168. This is another example of the continuing Defamation by Implication, that the Defendant through publishing by implying that the Plaintiff Dr. Petrou files "frivolous" complaints and letters and ignored the extensive substantiating evidence that was posted on the GoosiLeaks blog.  Furthermore, Defendant committed Defamation by Implication by omitting the fact that Judge Kuhnke ignored Plaintiff Dr. Petrou's request for an injunction regarding the eviction and never ruled on the

injunction. The Defendant omits the fact that two letters were written regarding the Russian money laundering and the subversion of the 2016 U.S. Presidential Election, one to Special Counsel Mueller and the DNC, both of which were deposited with the Washtenaw County Circuit and District Courts and publically available.  Instead, the Defendant implies that the letters are not public domain as only one letter was received "anonymously" in an effort to discredit the legitimacy of the letters (as questioned directly by the article itself).  Further by failing to provide specific details of the letters including the fact that the same statements were provided directly to the FBI thereby undermining the credibility of the letters and thus Plaintiff Dr. Petrou, the Defendant further defamed the Plaintiff Dr. Petrou.

169. Further, the Defendant continued its deliberate campaign to paint Plaintiff Dr. Petrou in a false light by failing to report on extensive readily available evidence that would dispel the clearly false statements and narrative the Defendant maliciously propagated through publication.  The first two articles published by the Defendant repeatedly reference Plaintiff Dr. Petrou's "GoosiLeaks" blog but fail to report on these critical pieces of evidence clearly constituting Defamation by Implication.

170. These deliberate omissions of evidence, thus constituting Defamation by Implication, that were available on Plaintiff Dr. Petrou's blog "GoosiLeaks" include but are not limited to the following:

    a)    Laycock's email to architect Theresa Angelini in which he threatens to "pursue the criminal claim", and "push ethics violations with the university of Michigan regarding their position as professionals" as he "want to gets paid" (posted 8-13-17).

    b)    Letters of refusal by the Ann Arbor Police and the City of Ann Arbor to release the police affidavits freezing Plaintiffs bank accounts as required by state law to Plaintiff Dr. Petrou despite FOIA and FOIA appeals (posted 8-14-17, 9-23-17, and 10-16-17).

    c)    Faupel's email from 8-10-17 and subpoena by Marion Faupel, Laycock's attorney, that Faupel obtained Plaintiff's husband's Dr. Foerster's 2017

letter of reprimand from the Ann Arbor VA even though subpoena was only for financial documents through the end of 2016 which is a clear abuse of subpoena power (posted 8-14-17).

d)   Phone recordings of voice messages from Detective Rougeau, Faupel and Laycock attempting to solicit Dr. Paul Cronin as a false witness against Plaintiff Dr. Petrou (posted 8-16-17).

e)   Paul Cronin's deposition by Faupel on 6-20-17 in which he denies under oath "Nick's" false allegation that Plaintiff Dr. Petrou was extorting Paul Cronin (posted 8-16-17).

f)   Plaintiff Dr. Petrou's email to Detective Rougeau asking why he had disclosed extensive details of Maria Petrou's complaint and police investigation to Faupel (posted 8-16-17).

g)   Faupel's email intended for Detective Rougeau in which Faupel discusses prosecution of Plaintiff Dr. Petrou (posted 8-16-17).

h)   Judge Archie Brown's ruling from 6-19-17 that the construction contract was "unequivocally a fixed price contract" (in direct contradiction to Laycock's civil complaint) and that was no fraudulent inducement by Plaintiff Dr. Petrou as well as the fact Plaintiff Dr. Petrou had made substantial out of pocket payments to Laycock (posted 8-18-17).

i)   Faupel's subpoena on 6-20-17 of Ms. Duaa Altaee (NIH R01 research coordinator) and Dr. Reed Dunnick, University of Michigan Radiology Chair, for Laycock's civil lien case (posted 8-18-17).

j)   Faupel's email to Paul Cronin on 8-11-17 asking Paul Cronin if he wanted to purchase Plaintiff's properties at the Sheriff's sale (posted 8-18-17).

k)   Letters signed by Plaintiff Dr. Petrou's closest childhood friends from Cyprus attesting to her good character and that Plaintiff Dr. Petrou has looked after and provided for her parents over the years (posted 8-19-17).

l)   Emails from Theresa Angelini to Laycock that she supported Laycock's liens, that the contract was not a fixed-price contract, and that she assisted in writing and preparing Laycock's civil lien case against Plaintiff Dr. Petrou while under contract with Dr. Petrou (posted 8-21-17).

32

m)  Email between Angelini and Laycock from 12-8-15 that there were secret emails between them exchanging weekly cost tracking documents for the construction costs (post 8-21-17).

n)  Email from Laycock to Angelini and Plaintiff Dr. Petrou from 1-9-17 that Angelini was responsible for reviewing and approving the sworn statements (posted 8-21-17).

o)  Faupel's second subpoena on 7–19-17 of Ms. Duaa Altaee (NIH R01 research coordinator) and Dr. Reed Dunnick, University of Michigan Radiology Chair, for Laycock's civil lien case (posted 8-24-17).

p)  Plaintiff Dr. Petrou's contract with Angelini that final payment for construction costs was not due until punch list was complete which it was not (posted 8-24-17).

q)  Angelini's email to Faupel and Laycock from 2-1-17 falsely accusing Plaintiff Dr. Petrou of slandering (posted 8-25-17).

r)  Laycock's emails to Faupel and Angelini from February 2017 threatening criminal claims against Plaintiff Dr. Petrou and calling Plaintiff Dr. Petrou and her husband "diabolical, deplorable, disgusting, thieves" (posted 8-25-17).

s)  Telephone records documenting two phone calls between Laycock and Plaintiff Dr. Petrou's mother, Maria Petrou, on 2-23-17 the same day Laycock filed his civil lien complaint (posted 8-26-17).

t)  Faupel's emails to Plaintiff Dr. Petrou's attorney in which she uses Maria Petrou's false embezzlement claims to further Laycock's civil lien case (posted 8-26-17).

u)  Laycock's emails to Plaintiff Dr. Petrou, Angelini and Faupel in which he focuses on Maria Petrou and threatens to report Plaintiff Dr. Petrou to Child Protective Services and asks for Faupel's advice (posted 8-26-17).

v)  Signed construction contract from 5-1-17 documenting that punch list needs to be complete before final payment is due (posted 8-27-17).

w)  Laycock's email to Plaintiff Dr. Petrou and the bank dated 8-24-15 in which Laycock states he can finish the house construction for the revised

construction loan amount (posted 8-27-17).

x)  The Merrill Lynch Durable Power of Attorney (DPOA) granting Plaintiff
Dr. Petrou broad authority to manage Maria Petrou's investment accounts
(posted 8-27-17).

y)  The final signed sworn statement by Laycock dated 11-29-17 that balance to
complete is only $36K (posted 8-27-17).

z)  Angelini's email to herself dated 1-2-17 in which she goes at length to
discredit Plaintiff Dr. Petrou (posted 8-27-17).

aa)  Punch list prepared and initialed by Angelini on 1-30-17 documenting that
the punch list is not complete (posted 8-27-17).

bb)  Laycock's affidavit signed on 6-30-17 stating under oath: "I have never met
Maria Petrou and have never had contract with her." (posted 8-27-17).

cc)  Judge Brown's sanction of Faupel on 6-13-17 for discovery abuses (posted
8-27-17).

dd)  Recording of interview by Detective Bradley Rougeau of Ann Arbor Police
of Plaintiff Dr. Petrou on 3-7-17 in which Dr. Petrou repeatedly informs
Detective Rougeau that "no crime was committed" and documents that
Detective Rougeau executed the first search and seizure without and prior to
obtaining the DPOA (posted 8-29-17).

ee)  Recording between Jeff Cohen of Merrill Lynch and Plaintiff Dr. Petrou on
3-3-17 documenting that all the necessary paperwork was in order for Maria
Petrous' investment accounts (posted 8-29-17).

ff)  Recording between Detective Rougeau and Plaintiff Dr. Petrou on 2-23-17
in which Detective repeatedly refuses to provide Dr. Petrou with a written
statement of the allegations leading the search and seizure resulting in the
freezing of Dr. Petrou's PNC accounts (recording posted 8-30-17, transcript
of recording posted 12-4-17).

gg)  Email between Detective Rougeau and Paul Cronin from 8-16-17 in which
Detective Rougeau attempts to solicit Paul Cronin as a false witness against
Dr. Petrou (posted 8-31-17).

hh)  A recent federal complaint, *Edwards _v _Bradley M Rougeau,* against

34

Detective Rougeau for constitutional rights violations filed by another party (posted 9-1-17).

ii)   A phone message recording from Maria Petrou to Plaintiff Dr. Petrou in which Maria Petrou states: "..May God help you understand why and how things have turned so bad for you..." (posted 9-3-17).

jj)   An email from Mark Evans, Dr. Petrou's attorney, dated 9-3-18 in which Mark Evans states that the Bank of Ann Arbor have settled with Laycock that the Bank of Ann Arbor and Liberty Title would paid Laycock an undisclosed amount in an undisclosed agreement (posted 9-7-17).

kk)   Final waiver of liens package from Liberty Title documenting that there were at least 5 missing waivers of lien from Laycock (posted 9-11-17).

ll)   Recording of meeting between Plaintiff Dr. Petrou, Bradley Foerster and Bank of Ann Arbor Vice-President Cynthia Livesay and Pat McVeigh, counsel for Liberty Title, on 2-28-17 in which they state the bank and title company cannot weigh in on legitimacy of liens, do not have responsibility to report bank fraud, that they have all the waivers of lien, and denies Plaintiff Dr. Petrou to continue to make payments against the construction loan to protect credit rating (posted 9-16-17).

mm)   Bank of Ann Arbor motion dated 5-31-17 against Laycock in which the bank states that Laycock is "little bit of fast and loose playing with the numbers" and "would appear to be a double dip" (posted 9-19-17).

nn)   Bank of Ann Arbor motion dated 6-1-17 against Laycock in which the bank states that "CRJL [Laycock] now claims that this statement, (which Christopher Laycock swore to under oath), is untrue. CRJL has recently submitted a Sworn Statement dated April 17, 2017 which is dramatically different from and grossly contradicts the statements made under oath in the November 29, 2016 Sworn Statement." and "Indeed this 'right to rely' on sworn statements is so central to the Construction Lien Act the Act even reinforces the right by assessing criminal penalties for making false statement in a sworn statement with an intent to defraud." (posted 9-20-17).

oo)   Documentation that Faupel was designated as the foreclosure trustee for

Plaintiff Dr. Petrou's house 1745 Brian Court that was used as collateral for the construction loan (posted 9-22-17).

pp) Witness list for Maria Petrou's counter-complaint dated 9-15-17 against Dr. Petrou in which Maria Petrou calls Dr. Petrou's supervisors at the University of Michigan including Dr. Reed Dunnick, Dr. Eva Feldman, "Nick B", and even Dr. Robert Welsh to testify against Dr. Petrou (posted 9-24-17).

qq) Bank of Ann Arbor response to Dr. Petrou's Motion to request in which the bank states "Plaintiffs are able to obtain an end mortgage from any one of a number of lenders." (posted 9-26-17).

rr) Email from Michael Reynolds, attorney for Dr. Petrou, dated 6-20-17 to Dr. Petrou that "Yes, they [Bank of Ann Arbor] believe that Laycock liens are vexatious and sanctionable." (posted 9-27-17).

ss) Letter dated 9-22-17 from the Bank of Ann Arbor refusing to release the complete construction loan application to Plaintiff Dr. Petrou (posted 10-18-17).

tt) The affidavits of the PNC search and seizure obtained from the Attorney Grievance Commission in which it is documented that the primary witness is Petros Petrou who has a diagnosis of dementia (posted 11-9-18).

uu) A letter from Plaintiff Dr. Petrou to Maria Petrou informing Maria that Dr. Petrou is very sad that Dr. Petrou has to chose between interacting with her father and protecting her children given that Maria Petrou has made false criminal allegations against her. Dr. Petrou asks Maria Petrou to "do the right thing for your sick husband, your grandkids, your daughter and your son in law who have been nothing but kind to you over the years." (posted 12-13-17).

vv) Recordings between Duaa Altaee and Maria Petrou in which Maria Petrou admits she went to the police to force Plaintiff Dr. Petrou back into a relationship with her (posted 1-11-18).

ww) Deposition of Laycock from 10-24-17 in which Laycock admits under oath that Laycock controlled and prepared the sworn statements directly

contradicting his sworn affidavit from the civil lien complaint filed 2-23-17 (posted 1-16-18).

xx)   Bank of Ann Arbor signed loan document stipulating that Bank of Ann Arbor required first lien position and a fixed price contract in order to approve the construction loan (posted 1-20-18).

yy)   Affidavit signed by Plaintiff Dr. Petrou and Bradley Foerster for redemption of 1745 Brian Court that Bank of Ann Arbor foreclosed on the property despite not having first lien position (posted 1-20-18).

zz)   Email between Faupel and "Nick B" dated 8-14-17 in which "Nick B" falsely accuses Plaintiff Dr. Petrou of a sex scandal involving Paul Cronin and falsely accuses Dr. Petrou of extorting Paul Cronin. "Nick B" rubber-stamps the false allegations by using Dr. Ella Kazerooni's (Vice-Chair of Radiology) and Chair, Dr. Reed Dunnick's names (posted 1-22-18).

aaa)  Affidavit signed by Plaintiff Dr. Petrou denying "Nick B's" false allegations of any sex scandal (posted 1-22-18).

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Dr. Petrou requests judgment against Defendant for the following:

A.   An order that Defendant Ann Arbor Observer retract all published articles, including removing all published articles online, involving Plaintiff Dr. Myria Petrou

B.   An order that Defendant Ann Arbor Observer issue and publish a public apology to Plaintiff Dr. Myria Petrou.

C.   An order that Defendant Ann Arbor Observer identify all sources of the false statements as well as specifically identifying who contributed towards each of the false statements.

D.   An order that Defendant Ann Arbor Observer identify all contributing writers and editors to the published articles involving Plaintiff Dr. Myria Petrou.

E.   Determine that Defendant Ann Arbor Observer is liable for defamation and award

Plaintiff Dr. Myria Petrou $15,000,000.00 to be determined at trial.

F.     Award punitive damages to Plaintiff Dr. Myria Petrou in an amount to be determined by a jury.

G.     Award statutory interest to Plaintiff Dr. Myria Petrou on all damages.

H.     Award any other relief that this Honorable Court finds just and equitable.

## <u>JURY DEMAND</u>

**Plaintiff Dr. Petrou respectfully demands a jury trial on all issues so triable.**

Dated: October 1, 2018

Myria Petrou (in Pro Per)
820 E. Foothill Blvd, Unit A
Monrovia, CA 91016
(626) 272-7393
petroumyria75@gmail.com

# Exhibit A



| | |
|---|---|
| | **EVENTS** |
| | **NIGHTSPOTS** |
| | **RESTAURANTS** |
| | Ann Arbor Weather: Overcast & 28 F |
| | **SEND A TIP** |

# Ann Arbor Observer

>> AnnArborObserver.com >> Articles >> News



Click image for larger version.
Photo © J. Adrian Wylie

# The Battle of Geddes Ridge

**Two U-M doctors set out to build a dream house. It's been a nightmare for all involved.**

by Michael Betzold

From the January, 2017 issue

### "Raising the Flag"

In September, a colorful banner appeared on the side of a trophy home on Ann Arbor's east side. It bore a stylized image of a bird and the words "GoosiLeaks / The Story of Belief & Betrayal."

A photo of the banner was published online at goosileaks.blogspot.com with the headline "Raising the Flag." Other posts soon welcomed readers who'd seen ads for the blog in the *Tuscola County Advertiser, the Cyprus Mail,* and the Observer.

Michigan's Thumb, an island in the Mediterranean, and Ann Arbor are connected through the blog's creators, U-M physicians Brad Foerster and Myria Petrou. Though it says it's "about our life experiences in Ann Arbor," posts on the couple and their two young children are rare. GoosiLeaks is mostly devoted to the

many disputes swirling around the couple's dream house off Geddes Rd. With dueling lawsuits, a criminal investigation, family conflicts, and allegations of wrongful death, it's a tale so byzantine that, in an email posted on the blog, a friend of the couple compares it to a Greek tragedy--or a soap opera.

In their blog and in court, Foerster and Petrou claim that the builder of their dream home, Christopher Laycock, committed bank fraud. Laycock says the couple defrauded him. He's suing to collect liens for $274,000 in unpaid work.

The couple also contend that their constitutional rights were violated when a local magistrate froze their bank accounts after Petrou's mother went to the Ann Arbor Police Department for help locating hundreds of thousands of dollars that disappeared from an investment account. According to Petrou and Foerster, Petrou's mother wanted the money taken from the account belonging to her and her husband; they say she went to the police "to try to force [Petrou] back into a relationship with her."

Petrou and Foerster have sued the Bank of Ann Arbor in an unsuccessful attempt to halt foreclosure on a $1.5 million loan. And they've filed professional

**...continued below...**

complaints against the architects who designed their home, the accountant who audited Laycock's liens, Laycock's attorney, and an attorney who represented them against Laycock.

They've also filed lawsuits in state and federal courts against Laycock, architect Theresa Angelini, the City of Ann Arbor, two AAPD detectives, and Petrou's mother, Maria Petrou. The suits allege that some or all of the defendants violated the couple's rights under the Fourth, Fifth, and Fourteenth amendments, defamed them, and caused Petrou's miscarriage.

"I've never seen anyone litigate with as much malice as they have," says veteran attorney Marian Faupel--herself the target of one of the professional complaints. In court Faupel fired back, blaming Laycock's wife's suicide on stress his business suffered from the dispute with the doctors over payment for his construction work.

The Michigan Attorney Grievance Commission ruled against Foerster and Petrou's complaint about Faupel, who retired from the case last summer. She says her small firm was simply overwhelmed. "I can't do five lawsuits in three different jurisdictions," she says. "Litigation was coming out of the sky."

Laycock's current attorney, Jeremy Kennedy, declined to comment for this article, as did city officials and many individuals targeted in the couple's lawsuits and complaints. "Everybody feels sort of terrorized," Faupel opines.

Foerster and Petrou did not respond to interview requests; nor did their attorneys. But in court filings, they've called Laycock's lawsuit "punitive, retaliatory and extortionate." One of their attorneys offered $80,000 to settle the liens, less than one-third of the total. When Faupel proposed mediation, another attorney emailed that he'd recommend it only if the project's architects, Theresa and Brad Angelini, "bring their checkbook or deed to their home with surrender of their licenses. Laycock's license is at risk as well. You and Laycock wanted a fight to the death and you should be overjoyed at your accomplishment."

Today, the huge Prairie-style dream house crouches on a dusty, weed-choked lot with no lawn. The lot next door, originally planned as a homesite for Petrou's parents, stands empty.

**The dream house**

Foerster went to high school in Caro on his way to medical school at the U-M. Petrou, a native of Cyprus, arrived a few years later for postgraduate training in radiology. They married in 2004, and both are now on the faculty of the U-M Department of Radiology. Foerster, forty-seven, is an associate professor earning $160,000 a year and also works at the VA Ann Arbor Health System, where he earned $255,487 in the fiscal year ending September 2016. Petrou, forty-two, is a U-M assistant professor, making $200,000.

They used to live in a two-story colonial in a secluded subdivision off Chalmers Dr. near Arborland. But about six years ago they set out to build something grander-- and a lot more expensive.

Their 10,000-square-foot dream house would have four bedrooms, a three-car garage, and a rooftop deck. An elevator. *Eight* bathrooms. And a staircase cantilevered so that the treads seemed to be floating on air.

On Geddes Ridge, an exclusive private lane perched above the Huron River near Gallup Park, the couple bought two adjoining lots for $256,000 apiece--one for their dream house and one for Maria and Petros Petrou, retired high school principals who'd joined their daughter and grandchildren in Ann Arbor.

In 2012 Foerster and Petrou hired the Angelinis to design both homes--but according to Laycock's lawsuit, they also consulted an architect in Greece throughout the construction. Their first builder, the lawsuit says, estimated the work could be done for less than $125 per square foot; Laycock said a realistic price would have been $250-$300. Unsurprisingly, the project sank midstream.

According to Faupel the house stood half-finished, with no windows and a temporary roof, for more than a year before the couple hired Laycock, a builder of custom homes based in Saline. The two sides came to disagree strongly on the terms of their contract and the amount in dispute. But according to Laycock's lawsuit, he found the house with a basement filled with debris and animals and the walls three inches out of plumb.

The couple simplified the plan somewhat, scrapping the rooftop deck. But according to Laycock's complaint they failed to make a promised initial payment and didn't keep up with mounting costs as they added upgrades like white oak flooring and a glass staircase railing.

Renee Laycock took her own life July 7, 2015. Once an accountant for Faupel's law firm, she also kept the books for her husband's construction business. In his lawsuit, Laycock writes that his wife "died on the day a

significant payment from Foerster and Petrou was due." According to Faupel, the money would have covered $200,000 owed to suppliers and subcontractors. Faupel says her former employee had been struggling with mental health issues and that the shock of learning the payment was not coming "helped push Renee over the top."

The following month, the doctors got a $1.5 million construction loan from the Bank of Ann Arbor, mortgaging their colonial on Brian Ct. as part of the deal. Though $300,000 went to pay off an existing loan from Old National Bank, according to Laycock's complaint the couple repeatedly assured him the new bank loan gave them the funds needed to finish the work. But by mid-2016, even as the dream house was nearing completion, Laycock and the doctors were deeply at odds over payments and the contract terms.

According to Laycock's complaint, even after the family moved into the home in November 2016 with a temporary certificate of occupancy, he continued sending in subcontractors for final touches. At least one of them, glass supplier Glasco Corp., ended up suing him, though unsuccessfully. According to Faupel, other subcontractors have never been paid.

**A family torn apart**

Myria Petrou was once so close to her parents that she planned a home for them next door. Now they haven't talked in months and are legal adversaries. A blog post reveals that Fr. Nicolaos Kotsis, the priest at St. Nicolas Greek Orthodox Church, was enlisted as an intermediary in a failed attempt to get the couple's children to see their grandfather on his birthday in October. (Kotsis did not return calls.)

When Petrou's parents arrived in Ann Arbor, they signed a power of attorney giving their daughter significant control over their life savings of nearly $1 million. In her counter-complaint to her daughter's civil suit, Maria Petrou contends that she and her husband (who has since been diagnosed with dementia and Parkinson's) were misled into signing documents they didn't understand.

According to an affidavit by AAPD detective Brad Rougeau, in November 2016 Myria Petrou emptied her parents' Merrill Lynch investment account, transferring nearly $234,000 to her own PNC account. In her counter-complaint, Maria Petrou charges that her daughter and son-in-law "unlawfully" took her and her husband's funds "for their own use including additions to an expensive new residence."

In the blog, the couple write that Myria Petrou took the money with her mother's permission. But Maria Petrou's attorney, Jim Reach, says his client wasn't told about the withdrawal. At around the same time, he says, Petrou broke off all communication with her parents.

Reach says that Maria Petrou went to the AAPD for help in determining what happened to her money but

never asked for criminal charges against the couple. After interviewing her, however, Rougeau initiated an embezzlement investigation.

GoosiLeaks tells a very different tale. According to the blog, Petrou had a miscarriage on February 16. She called her mother to tell her but "received no sympathy and no acknowledgement for her loss." Instead, the couple write, "Maria was yelling about her accounts, that Maria had 'no choice' but to go to the police to 'get to Myria.'"

In their state and federal lawsuits, the couple blames the miscarriage on stress from Rougeau's investigation. By initiating two searches and seizures of their bank assets, they charge, he acted "either intentionally to harm or with gross reckless disregard for ... whether damage or harm would result to Myria Petrou or her unborn child."

The first seizure, authorized by district court magistrate Tamara Garwood based on Rougeau's affidavit, occurred February 9; the second took place March 13, almost four weeks *after* the miscarriage. The wrongful death claim has since been dismissed in state court, but not in the federal case, which has moved more slowly.

Mother and daughter remain estranged. In a December blog post, Petrou reported receiving a voicemail from her mother saying that her father's health was failing "and all he wants is to see his grandkids." Petrou responded by blaming her mother's "false testimony" for keeping the children from their grandparents--and directing her lawyer to stop her mother from contacting her.

**"Standing up for Civil Rights"**

A Thanksgiving Day post on GoosiLeaks places the couple's legal battles in the context of historic crusades for social justice. They write that they are "standing up for Civil Rights and providing a small but we think important example to society around us." While activists such as Rosa Parks and Martin Luther King Jr. "faced far worse violations of their Civil Rights," they acknowledge, "their prior struggles have allowed us to have a voice in these challenges today."

Foerster and Petrou have written to many U.S. senators and local doctors and complained to governor Rick Snyder and attorney general Bill Schuette about "police corruption" and a "conspiracy" against them. They've made similar charges to Ann Arbor mayor Christopher Taylor, city councilmembers, and police chief Jim Baird. They told the FBI that they believe Laycock committed bank fraud. In addition to Faupel and the Angelinis, they filed formal complaints against their original attorney in the construction case, Ed Hood, and accountant Russ Agosta, who at Hood's request did an audit of the construction liens. They tried to get one local court to take over their case from another. To date, none of those efforts have succeeded.

Foerster and Petrou have posted many legal documents from the case on GoosiLeaks. The blog also features more than two dozen recordings of conversations with their enemies and allies. ("Virtually any contact with these two people is taped," says an exasperated attorney for one of their adversaries.) In one recording, Foerster asks a fellow U-M radiologist, Aine Kelly, why Maria Petrou might be "making up these false allegations against us? ... What do you think her objective is?"

Kelly answers: "To bring pain to all of us."

"What do you think the truth is?" Foerster persists.

"We're the truth," Kelly replies.

In another recorded call, Foerster tells his mother, Shirley Foerster, that the couple "had no choice" but to sue Petrou's mother. He also complains that his mother-in-law's proposed witness list includes his children. Yet the couple themselves have repeatedly involved the children in their disputes. In a video posted on the blog, Foerster asks their daughter Maria--named for her grandmother--why she thinks "your Grandma says that you might not belong to us?"

"Cause she wants to take me to California," the youngster replies.

"Why would she want to do that?" Foerster continues.

"Because she wants you and mommy to be sad."

Maria Petrou and her husband still live in Ann Arbor. The blog offers no explanation of why or how she might want to take the children to somewhere in California.

Then there's a remarkable November post that includes an affidavit from Petrou that she's never abused her children nor had extramarital sex. The Observer could find no record of anyone accusing Petrou of child abuse--unless you count a sarcastic remark in a 2016 email from Laycock. (After assuring the couple that the home's heating and cooling system posed no threat, he made a snarky joke about calling Child Protective Services if they were still worried.) And what the blog calls a "fabricated sex scandal" seems to be a response to a cryptic comment by Rougeau, the AAPD detective, about the couple's "complicated relationship" with Aine Kelly's husband, Paul Cronin.

**A generous colleague**

Cronin--yet another U-M radiologist--has loaned Foerster and Petrou at least $150,000 during the house construction. In a deposition on June 20, 2017, Cronin said he provided $80,000 and later $50,000 more, simply because the couple told him they were short on cash--and that he since has paid at least another $20,000 in attorney fees to lawyer Cyril Hall, who was jointly representing them and him.

Cronin and Kelly, both natives of Ireland, are longtime friends with Foerster and Petrou. They have children of

similar ages and have vacationed together. Cronin joined the couple in court in April 2017--"I went as moral support for my friends," he said at his deposition-- and acknowledged paying a retainer to Hall.

Though Cronin's initial loan was in August 2016, Faupel notes in the deposition that the promissory note was not notarized until three days after the April 2017 court date. The loan carries no interest and is not repayable until December 2027. "I trust my friends to pay me back," Cronin testified in the deposition.

If the story weren't already tangled enough, the night before the April court date Laycock reportedly got a series of anonymous phone calls. Faupel, his attorney at the time, says she got one too. During the deposition in June, Faupel played recordings of a man, who claimed to be a work colleague and called himself "Nick," claiming Foerster was extorting money from Cronin. In subsequent emails to Faupel, "Nick" claimed Cronin was drinking a lot, arguing so much that neighbors called police, and selling properties in Ireland to fund his friends' legal battles. In keeping with the soap opera nature of the story, "Nick" claimed to Faupel another, more intimate reason that Cronin was entangled. The exact accusation is not public, but the doctors alluded to it in the "fabricated sex scandal" post.

So far, attempts to track down "Nick" have failed. In the "fabricated sex scandal" post, the doctors include the email Nick used in communications with Faupel. No one answered the Observer's messages to that address.

**End game**

The doctors' legal crusades have so far made little headway. When they tried to delay the foreclosure sales for their two houses, judge Archie Brown not only ruled against them but ordered them to pay the bank's attorney, LeRoy Asher, more than $11,000. He has also ruled that Laycock's liens are valid. In the doctors' state lawsuit, the couple have dropped all defendants except Laycock and Maria Petrou. In their federal suit, they've dropped the Angelinis as defendants, and the city has moved to be dismissed as well.

As the Observer went to press, however, the Battle of Geddes Ridge was still raging. The AAPD's report on the embezzlement investigation was in the hands of the county prosecutor. "Once the investigation has been reviewed, we will know if criminal charges will be filed," emails AAPD public information officer Matt Lige. "I have no time line as to when we will hear from the prosecutor's office."

Meanwhile, the legal bills continue to mount. Faupel says her firm alone has spent at least $200,000 and that Asher has budgeted $250,000 to defend the Bank of Ann Arbor in court. (Asher didn't return phone calls.)

The costly court battles may be starting to weigh on the doctors--and their attorneys. Cyril Hall, who's handling both their state and federal lawsuits, asked the state

court to let him withdraw after Petrou emailed the court in September saying she and her husband wanted to represent themselves. Hall later withdrew his motion, but in November attorneys Michael Reynolds and Mark Evans, who were defending the couple against Laycock's original suit, made a similar request. They cited a breakdown in communication--and also a lack of payment. In a December order, Judge Brown approved their request.

In December, the GoosiLeaks banner was still hanging on the house on Geddes Ridge. It may not be there much longer, however. Both that home and their old home on Brian Ct. went into foreclosure this past summer. If the doctors don't redeem them by February 3, the Bank of Ann Arbor will own them.

Foerster and Petrou would need to come up with more than $1 million to retain their 10,000-square-foot trophy home. But they could redeem Brian Ct. for less than $100,000--and according to a December GoosiLeaks post, that process has already started. After all the financial and emotional pain surrounding their dream house, the family may end up back where they started six years ago.

---

## BATTLING THE U

While fighting to hold onto their dream house, Bradley Foerster and Myria Petrou have also been involved in controversy at Michigan Medicine.

Foerster and a radiology department colleague, Robert Welsh, are co-principal investigators on a National Institutes of Health research grant. In August 2014, Duaa Altaee was hired as their research coordinator. In the spring of 2015, Altaee filed a charge of sexual harassment and retaliation with the U-M Office for Institutional Equity (OIE) against Welsh and the department. Foerster filed a related charge, saying that he was a witness to the alleged harassment and that Welsh had retaliated against him, too.

Foerster and Petrou also accuse Welsh of defrauding the NIH. Last summer, Petrou emailed the agency to accuse Welsh of receiving money for work he hadn't performed. Welsh left for the University of Utah in 2016; neither he nor Altaee could be reached for comment. Mary Masson of Michigan Medicine's office of communication won't say why Welsh left but does say he still officially has a job at U-M. Citing institutional privacy policies, university officials decline to comment on the harassment complaint.

Masson says the U-M general counsel's office took the fraud charge "very seriously. We've conducted an extensive review but have not found anything to substantiate any of the allegations." Foerster, however, continues to insist that fraud was committed--in a July mass email, he called it a "whistleblower case."

In one of the story's many bizarre twists, the couple write in their blog that Altaee will be "the primary

witness in our conspiracy case in the federal court."
They don't explain how a U-M research coordinator
might have learned about alleged machinations
between their builder, architect, bank, family members,
and the Ann Arbor police. But Altaee does have at
least one connection to the dream house: after
Foerster and Petrou moved out of their former home
behind Arborland, Altaee and her husband moved in.



[Originally published in January, 2017.]

SHARE   Print  |  Comment   |  Email



**Government,
business,
environment, the U-M,
and more.**

>> Blogs

Millage Wins
"Andy LaBarre and Jerry
Clayton are geniuses!"
exclaims Ann Arbor
councilmember Chip Smith

Close Call
Chip Smith survives another
near miss.

New Path
"I had this idea that I was
uniquely qualified to pull it
off," says Karen Sikkenga.

Going Up
The DDA voted in October
to add three stories to the
Ann-Ashley parking
structure.

The Last Odd-Year Vote
As the city cuts back on
council elections,
independents make a last
stand.

Tax Votes
There are two big millages
on the November 7 ballot.

more news articles:
**1** | 2 | 3 ... 35 >

*read more stories here* ➔ **Marketplace  |  Culture  |
Community  |  News**

**You might also like:**



**Expensive Hotels**
*A clickable, zoomable map*

# Exhibit B

# Ann Arbor Observer



Click image for larger version.
Photo © Internet Archive:
Goosileaksblogspot.com

## Cat Fight

### For Stacy and David Markel, reading "The Battle of Geddes Ridge" was a revelation.

by Michael Betzold

From the April, 2018 issue

The article in the January Observer described litigation surrounding a home built by U-M physicians Bradley Foerster and Myria Petrou. The Markels, who live nearby, decided to check out the couple's blog, goosileaks.blogspot.com. There they found photos of the doctors' children playing with their cats, "Ginger" and "Tigsy"--who looked a lot like the Markels' own felines, "Atticus" and "Bear."

Now the Markels, too, are in court with Petrou and Foerster--seeking to reclaim the cats they say are theirs.

According to the Markels' complaint, starting last August, Atticus went missing for days or weeks at a time, and Bear, too, eventually went AWOL. Then, in a Dec. 9 post on Goosileaks, Foerster and Petrou sounded the alarm that "Ginger" and "Tigsy" had gone "missing." According to the Markels, that was the very date they last saw their own two cats. Late in December, Goosileaks trumpeted the news that the cats were back at the Foerster-Petrou residence.

After seeing the photos on the blog, the Markels say they visited, called, and mailed Foerster and Petrou--who responded by trying to get a restraining order against them (it was denied). The Markels called the police, but when an officer went to the doctors' house, they refused to turn over the cats.

So the couple enlisted their daughter, Alexandra Markel, an attorney at Bodman in Detroit. They're suing Petrou and Foerster in district court, seeking the cats, $300 in damages, and court and attorney costs.

Judge Joseph Burke ordered the doctors to bring the cats to the Humane Society of Huron Valley for examination. According to the Markels, on February 21, Foerster showed up with a cat, but it wasn't either of the ones pictured on the blog. At a second session on February 26, Petrou arrived with that same cat plus another. According to the court record, HSHV staff read the cats' implanted microchips. One had been chipped at the Toledo Area Humane

Society and was registered to Petrou. The second was registered to a man in Columbus.

Abbey Hall of the Toledo humane Society confirms that Petrou adopted a cat there on February 21, the very day her husband first presented it at HSHV. According to Alexandra Markel, the Columbus man had given up his cat to the humane society there, where it was adopted on February 24--just two days before Petrou presented it at the second HSHV session. (Neither the doctors nor their attorney in the case, Cyril Hall, responded to requests for comment.)

The Markels filed a motion to show cause why the doctors should not be held in contempt of court, but in mid-March, Alexandra Markel said that the parties were close to a settlement. And around the same time, the doctors notched a big legal win: prosecutors decided not to press charges over Petrou's transfer of hundreds of thousands of dollars from her parents' investment account to her own bank account.

The couple complained frequently about that financial investigation on Goosileaks, but if they're celebrating now, only their friends will know: The blog is now accessible by invitation only. Meanwhile, the doctors continue to face imminent eviction from their Geddes Ridge mansion--and their latest lawsuit has suffered a serious setback.

On a snowy day in early March, a throng of attorneys gathered in U.S. district court judge Sean Cox's courtroom in downtown Detroit. They represented dozens of defendants-- including builder Christopher Laycock, the City of Ann Arbor, the Bank of Ann Arbor, Petrou's own mother, and the Ann Arbor Observer--whom the doctors are suing under the federal Racketeering and Corrupt Organizations Act.

The massive, 319-page complaint alleged that the defendants were engaged in a criminal conspiracy against the doctors. It sought $5 million in actual damages and $100 million in punitive damages--which could triple, under RICO, to $300 million.

The complaint included attorney Cyril Hall's law license number and bore the printed signature "C. Hall." But Judge Cox had called the hearing to hear Hall's request to withdraw from the case. Under questioning from the judge, Hall said that he hadn't filed the complaint--and that the couple had told him they had filed it themselves. Cox couldn't question Petrou and Foerster directly, because they'd skipped the session.

The judge was not happy. In a subsequent order, he concluded that the complaint "bears a forged signature"--and added that someone had "sought to deceive the Court." Since the complaint was invalid, he wrote, he was throwing out the entire case.

The judge ordered both the doctors and Hall to appear at another hearing on April 5. In boldface type, he warned: "Myria Petrou and Bradley Foerster are cautioned that failure to appear for this hearing may result in the Court finding them in contempt."

*The RICO suit was dismissed without prejudice, so the couple could file it again--but they might have a hard time finding a new attorney. The defendants include three of their own former lawyers.* **AAO**

# Exhibit C

9/28/18, 6:24 PM

# Ann Arbor Observer



Click image for larger version.
Photo © Anonymous

## Losing Geddes Ridge

### After a last-ditch legal battle, two U-M physicians were evicted from their dream home in May.

by Michael Betzold

From the June, 2018 issue

Radiologists Brad Foerster and Myria Petrou moved into their Geddes Ridge mansion in November 2016. Less than three months later, their builder sued to enforce nearly a quarter-million dollars' worth of liens.

The doctors responded with a dizzying array of litigation. They've sued dozens of defendants--including the builder, their architects, mortgage and title companies, the city, and even Petrou's mother--who they claim conspired to drive them from the home. They sued the Observer, too, after it reported on the lawsuits ("The Battle of Geddes Ridge," January 2018).

That federal case was dismissed after the judge concluded that it was filed with a forged signature, but large parts live on in another suit filed in Washtenaw County Circuit Court in January. Acting as their own attorneys, the doctors accused twenty-three individual and corporate defendants of everything from mortgage fraud to legal malpractice. And they sought an injunction against being evicted from the Geddes Ridge house, which was foreclosed on last summer.

The injunction wasn't granted, and in early May the doctors' belongings were piled in the dirt outside their dream house. It's unclear where they're living now, and no one responded to emails to the address listed in the complaint.

At least the cats emerged unscathed. In one of the story's strangest twists, neighbors who read the January Observer story looked at the doctors' blog--where they spotted photos of their own two missing cats (Inside Ann Arbor, April). When the doctors refused to return them, David and Stacy Markel sued. Their attorney--their daughter Alexandra Markel--confirms that Bear and Atticus are now back home.

The doctor's own nearly 600-page January lawsuit remains active, but judge Carol Kuhnke has already dismissed eleven defendants. Kuhnke also awarded two of their former lawyers almost $38,000 in sanctions, reflecting their cost to defend themselves against the doctors' "frivolous" claims.

But the doctors aren't giving up. The same day they filed the fruitless request for an injunction, they apparently wrote a letter to Robert Mueller, the special counsel investigating Russian interference in the 2016 election. In the letter, a copy of which was provided to the Observer anonymously, they claim to have information about election meddling--and a racketeering network that launders Russian money in Cyprus.

*If the letter is legitimate, Petrou and Foerster now see themselves as victims of a global conspiracy. It says they are "huge targets for this racketeering network," and "are constantly battling fabricated criminal allegations aimed to discredit us as well as significant adversities in all aspects of our lives."* **AAO**

[Originally published in June, 2018.]

# Exhibit D

Ann Arbor Observer

August 27 2018

Dear Ann Arbor Observer,

We are writing to formally request a complete and full retraction of your January 2018 article entitled "The Battle of Geddes Ridge", the April 2018 article entitled "Cat Fight" and the June 2018 article "Losing Geddes Ridge" as well as an public apology due to the numerous inaccuracies and misleading statements published in these articles. We are also requesting that you print this letter in its entirety so that your numerous readers are correctly informed of the facts.

The numerous inaccuracies, misleading statements (some of which is propagated through incomplete investigation and selective extraction from the GoosiLeaks blog) and the needed corrections include (but are not limited to):

"In their blog and in court, Foerster and Petrous claim that the builder of their dream home, Christopher Laycock committed bank fraud. Laycock says the couple defrauded him. He's suing to collect liens for $274,000 in unpaid work."

In contradistinction to the above statement, Laycock in his sworn affidavit for his court complaint (case #17-154-CB) admits to bank fraud and falsely claims that we prepared and controlled the sworn statements. This accusation of Laycock - that we were involved in his sworn statement/bank fraud was acknowledged by our attorneys at the time Michael Reynolds and Mark Evans as well as multiple Bank of Ann Arbor and Liberty Title representatives during a meeting at the end of February 2017, after they reviewed Laycock's filed complaint. In Laycock's sworn deposition on October 24, 2017 Laycock reverses himself and correctly states that he controlled and prepared the sworn statements. In June 2017, Judge Archie Brown ruled that we did not defraud Laycock and that Laycock's lien only had first priority for $36K not $274K.

"they (Myria and Brad) say she (Maria Petrou) went to the police to force [Petrou] back into a relationship with her."

We have numerous recorded phone conversations of Maria Petrou and Duaa Altaee (portions of recordings published on the Goosileaks website) that Maria Petrou went to the police to force us back into the relationship with her, "it wasn't about the money", and if we spoke to Maria, she would drop her false criminal allegations. Maria Petrou subsequently confirmed what she had told Duaa Altaee in voicemails she left for Myria.

"I've never seen anyone litigate with as much malice as they have," says veteran attorney Marian Faupel—herself one of the targets of one of the professional complaints. In court Faupel fired back, blaming Laycock's wife's suicide on stress his business suffered from the dispute with the doctors over payment for his construction work.", "Everyone feels sort of terrorized," Faupel opines."

Faupel's false assertion in court that we contributed to Laycock's wife's unfortunate suicide preceeded our complaint to the Attorney Grievance Commission. We exercised our constitutional right to protect our interests in court and have never litigated with "malice" or "terrorized". We never had a dispute with Laycock during the time of the unfortunate suicide of his wife and Laycock never mentioned any financial stress or any relationship of our project to the suicide. In fact on August 13 2016 (over a month following Laycock's wife's death), Laycock emailed Brad regarding the delay in the financing: "Thanks Brad, no worries. Happy we are moving along. The only bad news is that you won't be moving in for Christmas.....:)."

"She (Faupel) says her small firm was simply overwhelmed. 'I can't do five lawsuits in three different jurisdictions," she says. "Litigation was coming out of the sky".

At the time Faupel removed herself, there were three lawsuits (two of which were exact duplicates) filed in two jurisdictions (U.S. Federal 6th District Court and Washtenaw Circuit Court). During Myria's deposition with both Laycock's attorney, Jeremy Kennedy and Angelini's attorney, Greg Thomas, Kennedy and Thomas stated that Faupel's conduct led what should have been a straightforward construction lien case to explode and get out of control and suggested that is why she was no longer part of the case.

"There 10,000 square-foot house would have four bedrooms, a three-car garage, and a rooftop deck."

630 Geddes Ridge is a 6417 square foot house as documented in the construction drawings.

"According to Faupel the house stood half-finished, with no windows and a temporary roof, for more than year before the couple hired Laycock, a builder of customer homes based in Saline.", "But according to Laycock's lawsuit, he found the house with a basement filled with debris and animals and the walls three inches to of plumb".

We terminated our contract with the prior builder in January 2015 who was performing work up to that point. Laycock started work on the house in March 2015 (as documented in Laycocks lawsuit). The basement was not filled with debris or animals. Only the staircase wall was out of plumb.

"But according to Laycock's complaint they failed to to make a promised initial payment and didn't' keep up with mounting costs as they added upgrades like white floor oak flooring and a glass staircase railing.

We did make payment to Laycock once the Bank of Ann Arbor approved us for the mortgage. Both Laycock and Angelini were fully aware of the issues surrounding the challenges of securing financing in summer of 2015 (please see above email from Laycock). The white floor oak flooring and glass stair railing were part of the original specifications included in the contract and we did make ongoing payments to Laycock to keep up with the costs.

"In his lawsuit, Laycock writes that his wife 'died on the day a significant payment from Foerster and Petrou was due.' According to Faupel, the money would have covered

$200,000 owed to suppliers and subcontractors.  Faupel says her former employee had been struggling with mental health issues and that the shock of learning they payment was not coming 'helped pushed Renee over the top.'"

Please see above evidence directly contradicting this incorrect statement.

"But by mid-2016, even as the dream house was nearing completion, Laycock and the doctors were deeply at odds over payments and the contract terms."

We were not at odds over payment and the contract terms in mid-2016 with Laycock. We repeatedly asked Laycock in Summer and Fall of 2016 for financial information so that we could make any needed payments and we made a payment of $65K + to Laycock in August 2016 for change orders and he assured us that we were up to date with payments.  It wasn't until we asked Laycock to substantiate his final bill in December 2016 (and by the way we never denied payment) that Laycock started placing exorbitant liens on 630 Geddes Ridge well in excess of his final sworn statement stating under oath that balance to complete was only $36K.

"Reach says that Maria Petrous went to the AAPD for help in determining what happened to her money but never asked for criminal charges against the couple."

According the police report, Maria and Petros Petrou initially requested prosecution for embezzlement.  Later Maria Petrou contacted Detective Rougeau to drop the case however Detective Rougeau maintained the investigation based on false criminal accusations by Laycock (based on Laycock's fraudulent pretense claim in his lawsuit and recordings between Laycock and "Nick B" who falsely claimed we were extorting Paul Cronin).  One week after Judge Brown dismissed the fraudulent pretenses claim, Reach contacted Detective Rougeau, on behalf of Maria and Petros Petrou stating that "his clients were again interested in prosecution."  The communications between Maria and Petros Petrou and their representative Jim Reach with the AAPD are clearly documented in the police investigation files.

"Then there is a remarkable November post that includes an affidavit from Petrou that she's never abused her children nor had extramarital sex."  And what the blog calls a "fabricated sex scandal" seems to be a cryptic comment by Rougeau, the AAPD detective, about the couple's complicated relationship" with Aine Kelly's husband, Paul Cronin.

The affidavit was executed to protect Myria against further false sexual and associated false criminal allegations by "Nick B" who in an email to Faupel falsely accused Myria of an extramarital affair with Dr. Paul Cronin and that we were extorting Paul Cronin as a result.

"So far, attempts to track down 'Nick' have failed."

The "Nick" false sexual and criminal allegations have been reported to the University of Michigan per protocol including recent information from Paul Cronin regarding the identity of "Nick" and audio recordings between "Nick" and Laycock obtained from the Ann Arbor Police through FOIA. Regarding the false child abuse allegations, these pertain

to Foerster and we have evidence that Maria Petrou made false allegations to Child Protective Services regarding this matter which is in our RICO case.

"He has also ruled that Laycock's liens are valid".

Judge Brown on June 20 2017 ruled that Laycock only had first priority for lien in the amount of $36K.

"They (Mike Reynolds & Mark Evans) cited a breakdown in communication–and also a lack of payment. In a December order, Judge Brown approved their request."

There was no breakdown in communication with Mike Reynolds and Mark Evans. Paul Cronin and Aine Kelly had an agreement with Mike Reynolds & Mark Evans to serve as our guarantors for the legal fees which Mike and Mark later refused. Judge Brown cancelled the hearing scheduled for December 7 2017 and issues in a ruling dated December 6 2017 preventing us from presenting Judge Brown from all the relevant facts. Judge Brown ignored our email requesting a hearing on the matter.

"Foerster and Petrou also accused Welsh of defrauding the NIH.", Foerster, however, continues to insist that fraud was committed—in a July mass email, he called it a "whistleblower case".

We reported our concerns regarding Robert Welsh to the NIH and the University of Michigan, per protocol. Brad did not continue to insist that fraud was committed. Apparently, Brad's email was hacked sending out a mass email regarding this issue in July 2017 without Brad's knowledge or authorization. We have been victims of extensive identity theft and hacking well documented with the University of Michigan as well as affidavits filed with the Washtenaw County Court.

"Mary Masson of Michigan Medicine's office of communication won't say why Welsh left but does say he still officially has a job at U-M."

In a reply letter dated December 19 2017 to Ms. Duaa Altaee who requested a meeting with Mr. Timothy Lynch, University of Michigan Vice-President and General Counsel, to discuss the mishandling of her sexual harassment case, Mr. Lynch states: "As you likely know, that faculty member (i.e. Robert Welsh) left the University in May 2016 and moved across the country."

"After seeing photos on the blog, the Markels say they visited, called, and mailed Foerster and Petrou—who responded by trying to get a restraining order against them (it was denied). The Markels called the police, but when an officer went to the doctor's house, they refused to turn over the cats."

We never attempted to get a restraining order against the Markels. Brad informed Officer Boylan that the cat issue was not a criminal issue (to which hOfficer Boylan agreed) and that the Markels could proceed with a civil suit.

"The Markels filed a motion to show cause why the doctors should not be held in contempt of court, but in mid-March, Alexandra Markel said that the parties were close

to a settlement."

We were not held in contempt of court. We never stole any cats. The whole cat story was bizarre to say the least  but we can say that 1) when we initially took the cats to the vet in the summer of 2017 no microchip was detected. 2) At some point there were 4 orange cats scanned for a microchip with 5 microchip numbers emerging (how does that work?) and 3) the final scanning session/disposition of the cats was done via a third party in consultation with our attorney Cyril Hall.  We ended up signing a no-fault settlement with the Markels.

"And around the same time, the doctors notched a big win:  prosecutors decided not to press charges over Petrou's transfer of hundreds of thousands of dollars from her parents' investment account to her own bank account."

The prosecutors decision reads as follows: "Insufficient evidence to overcome various hurdles before probable cause exists to charge.  Suspect had power of attorney of parent's bank account(s).  Power of attorney specifically allowed the withdraw of funds. Based on the facts of the case parents paid little attention to bank account as money was being moved around for years.  Suspects withdrew funds and made statements that it was to purchase adjourning lots to build houses for parents and suspects.  Suspects also made statements that money was being use to care for parents.  Pending civil litigation is ongoing and this matter is clearly civil and does not rise to level of criminal culpability.  Conferred with APA Emmons and agreed that criminal charges are not appropriate."

We were never notified by the City or the Ann Arbor Police Department that the charges were dropped.  It is important to note that this decision was signed by the prosecutor on February 7 2018 (one year after Detective Rougeau initiated the investigation) and that the the "missing cats" case which was reported to the Ann Arbor Police by Stacy Markel in January 2018 was assigned for criminal investigation on February 7 2018 and involved Detective Sergeant Martin (Detective Rougeau's direct supervisor).

"The judge was not happy.  In a subsequent order he concluded that the complaint "bears a forged signature"—and added that someone had 'sought to deceive the Court.'"

We did not forge any signature for the court complaint. The case was prepared in conjunction with Cyril Hall and submitted in an identical fashion to our previous federal court case which did not result in any issues. Cyril Hall then changed his mind regarding his ability to represent us on the case but agreed to continue to advise us. The final opinion issued by Judge Cox states that "the Court does not believe that they sought to deceive it" and that "the court cannot conclude that they acted in bad faith".

"The judge ordered both the doctors and Hall to appear at another hearing on April 5.  In boldface type, he warned:  "Myria Petrou and Bradley Foerster are cautioned that failure to appear for this hearing may result in the Court finding them in contempt."

We were advised by our attorney Cyril Hall that our presence was not required at the March 2018 hearing.  We attended the April 2018 hearing as instructed and were not held in contempt or sanctioned by Judge Cox.

"Kunhke also awarded two of their lawyers almost $38,000 in sanctions, reflecting their cost to defend themselves against the doctors' 'frivolous' claims."

Judge Kunhkes rulings were in spite of numerous requests to stay the hearings based on legal and medical basis. Our attorney, Cyril Hall, informed us that he has never witness such exorbitant and excessive sanctions against Plaintiffs who are simply defending their constitutional rights.

"But the doctors are not giving up. The same day the filed the fruitless request for an injunction, they apparently wrote a letter to Robert Mueller, the special counsel investigating Russian interference in the 2016 election. In the letter, a copy of which was provided to the Observer anonymously, they claim to have information about election meddling—and a racketeering network that launders Russian money in Cyprus.

Judge Kuhnke ignored our request for an injunction regarding the eviction from our house and never addressed it. We did send a letter to Special Counsel Mueller as we have information (including audio recordings) which predate yet mirror the Steele Dossier and additionally describe racketeering network that launders Russian money through Cyprus. We have also reported this information to the FBI - as you know lying to the FBI is a felony which is something we could never engage in and therefore we do not understand why you would question the legitimacy of our testimony. The wording of your statement is puzzling for if the testimony is legitimate (which it is) then we do not "see ourselves" as part of an international conspiracy we would de facto be part of such a process. And can we ask if you have considered why two physicians with no past criminal history and no significant conflicts find themselves in such an inexplicable situation?

Once again, given the above facts, we are requesting a complete and full retraction of all three articles published about us in the Ann Arbor Observer as well as a public apology.

Sincerely,

*9-27-18*

Bradley Foerster, MD PhD
820 E. Foothill Blvd, Unit A
Monrovia, CA 91016
bradfoerster05@gmail.com
(734) 262-9209

Myria Petrou, MA MBChB MS       *8/27/2018*
petroumyria75@gmail.com

# Exhibit E

 **Gmail**                                        Bradley Foerster, MD PhD <bradfoerster05@gmail.com>

## Follow up regarding Petrou and Foerster

**Myria Petrou** <petroumyria75@gmail.com>                          Mon, Aug 27, 2018 at 5:02 PM
To: Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster <brfoerster@yahoo.com>, "editor@aaobserver.com"
<editor@aaobserver.com>, "mibetzoldmi@gmail.com" <mibetzoldmi@gmail.com>

Dear Mr Betzold and Ann Arbor Observer
We would like to clarify that the signed and initialed letter you received from us via email and fax today and should be
receiving via FedEx by tomorrow am is the only communication we have had with your publication aside from some
advertisements in 2017.
If you receive information/communications that appear to come from us please let us know immediately as we have
been victims of extensive hacking and identity theft as documented in our affidavits filed with the Washtenaw County
Circuit Court.
Please confirm receipt of this email.
Thanks a lot
Myria Petrou and Bradley Foerster

---

**John Hilton** <hilton@aaobserver.com>                            Wed, Aug 29, 2018 at 7:24 AM
To: Myria Petrou <petroumyria75@gmail.com>, Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster
<brfoerster@yahoo.com>, "mibetzoldmi@gmail.com" <mibetzoldmi@gmail.com>

We have received your message and your letter. We will review them carefully with our legal counsel.

**From:** Myria Petrou <petroumyria75@gmail.com>
**Date:** Monday, August 27, 2018 at 8:13 PM
**To:** Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster
<brfoerster@yahoo.com>, John Hilton <hilton@aaobserver.com>, "mibetzoldmi@gmail.com"
<mibetzoldmi@gmail.com>
**Subject:** Follow up regarding Petrou and Foerster

[Quoted text hidden]

---

**Myria Petrou** <petroumyria75@gmail.com>                         Wed, Aug 29, 2018 at 4:00 PM
To: John Hilton <hilton@aaobserver.com>
Cc: Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster <brfoerster@yahoo.com>,
"mibetzoldmi@gmail.com" <mibetzoldmi@gmail.com>

Thanks for the reply.
Again I would like to stress that the only communications we have had with your publication are through our signed
and initialed letter and the couple of emails referring to the letter.
We have not authorized anyone to communicate on our behalf
Please confirm,
Myria and Brad
[Quoted text hidden]

---

**John Hilton** <hilton@aaobserver.com>                            Wed, Aug 29, 2018 at 6:57 PM
To: Myria Petrou <petroumyria75@gmail.com>
Cc: Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster <brfoerster@yahoo.com>,
"mibetzoldmi@gmail.com" <mibetzoldmi@gmail.com>

We have received no other communications.

Buy local tickets at a2tix.com
[Quoted text hidden]

---

**Myria Petrou** <petroumyria75@gmail.com>                         Mon, Sep 17, 2018 at 8:10 AM
To: John Hilton <hilton@aaobserver.com>

Cc: Bradley Foerster <bradfoerster05@gmail.com>, Bradley Foerster <brfoerster@yahoo.com>,
"mibetzoldmi@gmail.com" <mibetzoldmi@gmail.com>

We are following up on this matter from three weeks ago.
Please update us as to the outcome of your review of our concerns with your legal counsel and your decision

Thanks a lot

Myria Petrou and Bradley Foerster

On Wed, Aug 29, 2018 at 7:24 AM John Hilton <hilton@aaobserver.com> wrote:
[Quoted text hidden]

---

**Myria Petrou** <petroumyria75@gmail.com>                                Wed, Sep 26, 2018 at 11:49 AM
To: Bradley Foerster <bradfoerster05@gmail.com>, John Hilton <hilton@aaobserver.com>, Michael Betzold
<mibetzoldmi@gmail.com>

Dear Ann Arbor Observer
This is our third and final request to retract the stories/errors published about us over the last 12 months and issue a
public apology.
Please let us know either way by the end of business this Friday 9/28/2018 via email regarding this matter.
We will be also sending this communication via certified mail.
Sincerely

Myria Petrou and Bradley Foerster

---------- Forwarded message ----------
From: Myria Petrou <petroumyria75@gmail.com>
[Quoted text hidden]
[Quoted text hidden]

# Exhibit F

September 26 2018

Ann Arbor Observer
Editor James Hilton, Reporter Michael Betzold
2390 Winewood
Ann Arbor MI 48103

**RE: CEASE AND DESIST LETTER**

Dear Ann Arbor Observer, Editor James Hilton, and Reporter Michael Betzold:

We are writing in follow up to our electronic, fax and paper communications to you dated **August 27 2018** pointing out a number of false statements about us in a series of articles you published about us in the last 12 months. We asked you to retract these false statements/publications and issue a public apology.

On **August 29 2018,** we received a brief response by Mr. Hilton stating that you are reviewing the matter with your legal counsel. We have not received any follow up communications despite reaching out to you again on **9/17/2018.**

We also reached out to you earlier today on **9/26/2018** asking you to send us a response as to what you intend to do regarding the already published articles the end of business on Friday **9/28/2018.**

We are also asking that you **cease and desist from publishing anything further about us or our children effective immediately, with the exception of a public apology, in the Ann Arbor Observer or other publication.** The misrepresentations and falsehoods already published about us in the Ann Arbor Observer are clearly defamatory, have resulted in direct and extensive damages to us including but not too limited to character assassination and tarnishing our good names and are therefore actionable if not retracted and if no public apology is issued.

Sincerely,

Myria Petrou and Bradley Foerster
820 E. Foothill Blvd., Unit A
Monrovia CA 91016
Petroumyria75@gmail.com
Bradfoerster05@gmail.com

# Exhibit G

Gmail - Cease and desist letter                                                          9/28/18, 6:29 PM

 **Gmail**                          Bradley Foerster, MD PhD <bradfoerster05@gmail.com>

## Cease and desist letter
1 message

**Wassom, Brian** <bwassom@wnj.com>                              Fri, Sep 28, 2018 at 10:06 AM
To: "bradfoerster05@gmail.com" <bradfoerster05@gmail.com>, "petroumyria75@gmail.com"
<petroumyria75@gmail.com>
Cc: "John Hilton (hilton@aaobserver.com)" <hilton@aaobserver.com>, Michael Betzold <mibetzoldmi@gmail.com>

Dear Mr. Foerster and Ms. Petrou;

This responds to your communications to the Ann Arbor Observer demanding retractions of, and an apology for,
articles it has published. Without prejudice to any of its rights and defenses, all of which are expressly reserved, it
suffices to say that we see nothing in our reporting that requires either a retraction or an apology, and you have given
us no basis to suspect otherwise.

You have also demanded that the Observer "cease and desist" from further reporting about you. Certainly you must
realize, however, that no one has the power to prohibit the Observer from speaking on matters of concern to its
readers—a vital civic function that is fully protected by the First Amendment to the US Constitution. To that end,
please note that the Observer is preparing a follow-up report on the lawsuit against Paul Cronin that you recently filed
in California. You can expect to be contacted for comment by Observer reporter Michael Betzold.

 **Brian D. Wassom** | Partner
**Warner Norcross + Judd LLP**
Southfield Address: 2000 Town Center | Suite 2700 | Southfield, MI 48075

Macomb Address: 45000 River Ridge Dr. | Suite 300 | Clinton Twp, MI 48038
p 248.784.5039 | m 586.420.4023 | f 248.603.9639
bwassom@wnj.com | Profile | Blog | Vcard | Twitter | LinkedIn

*This email and any attachments are solely for the confidential use of the intended recipient. If you are not the intended recipient,*

*please do not read, distribute or act in reliance on it or any attachments. If you received this email by mistake, please notify us*

*immediately by email, and promptly delete this email and any attachments. The attorney-client and work product privileges are*

*not waived by the transmission of this email. Thank you.*

# Exhibit H

*For 15th District court, State of MI*
*Case #18-0631-LT*

Michael Eisenkraft
Cohen Milstein Sellers & Toll PLLC
88 Pine Street, 14ᵗʰ Floor
New York, NY 10005
(212) 838-7797

Joseph Sellers, Geoffrey Graber,
Julia Horwitz, Alison Deich
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., Fifth Floor
Washington DC 2005
(202) 408-4600

April 23, 2018

Dear Mr. Eisenkraft, Mr. Sellers, Mr. Graber, Ms. Horwitz, Ms. Deich,

We are writing you to provide corroborating evidence and direct witness testimony for your recently filed Federal Court Case 1:18-cv-03501. Over the past two years and **prior to the release** of the Steele Dossier, we have come into knowledge and have evidence regarding collusion between the 2016 Trump Presidential Campaign, the Trump Presidential Administration, and Russia to unlawfully secure the United States Presidency.

Our information which supports and enhances your federal court case includes but is not limited to:
- That Donald Trump was actively pursuing business interests in Russia prior to the election.
- That Russia and specifically Putin had targeted Donald Trump for the five years preceding the 2016 Presidential Campaign. There was a quid pro quo agreement between Trump and Putin.
- That Russian intelligence services and specifically Putin has Krompromat on Donald Trump.
- That Donald Trump colluded with Russia, WikiLeaks, and Julian Assange to illegally obtain and disseminate damaging emails to the 2016 Clinton Campaign.
- That Donald Trump/Trump Campaign colluded with Russian intelligence services to hack the 2016 election count and specifically targeted the Mid-Western states.
- That Vice-President Mike Pence and House Speaker Paul Ryan were aware of the collusion between Donald Trump and Russia/Putin and supported it.
- That FBI Director James Comey colluded with Donald Trump/Trump Campaign against the Clinton Campaign to secure the election for Donald Trump.

We would be happy to serve as witnesses to your federal court case, including providing sworn affidavits, and re-iterate that we have substantiating evidence to support your claims. For full disclosure, we have also come into additional evidence for a racketeering organization that operates in Michigan and is involved in a Russian money laundering operation prompting us to file several reports with the FBI/DOJ and our own Federal RICO case (2:17-cv-11508). During and as a result, we have faced extreme retaliation both from the Ann Arbor Police Department and the Washtenaw County Court System.

Sincerely,

Bradley Foerster, MD PhD
630 Geddes Ridge Avenue
Ann Arbor, MI 48104
Bradfoerster05@gmail.com

Myria Petrou MA MB ChB MS
petroumyria75@gmail.com
(734) 709-4679

cc:   Tom Perez, Chair DNC
      Karen Peterson, Vice-Chair DNC
      Jaime Harrison, Vice-Chair DNC
      Ken Martin, Vice-Chair DNC
      William Derrough, Treasurer DNC

      Keith Ellison, Deputy Chair DNC
      Michael Blake, Vice-Chair DNC
      Maria Durazo, Vice-Chair DNC
      Grace Meng, Vice-Chair DNC
      Jason Rae, Secretary DNC

January 31, 2018

**Re: Russian Investigation**

Dear Special Counsel Mueller,

We are writing to report that we have extensive information/testimony relating to links between the Trump team/government and Russia, including substantial testimony on Russian interference in the 2016 election.

This information was volunteered to us and our friend Duaa Altaee and by individuals with reported ties to the Trump team and Russia/Vladimir Putin.

This information corroborates the information provided by the Steele Dossier as well as additional events which have been reported in the news in the last several months. The information passed onto us also adds new elements/dimensions to currently publicly available information about the links between the Trump team and Russia, interference in the 2016 election and ongoing Russian interference in our democracy.

Part of the information relates to a racketeering network which launders Russian money through Cyprus to the United States and is involved in extensive criminal activities. The information we are in possession of has rendered us and Duaa Altaee huge targets for this racketeering network and we are constantly battling fabricated criminal allegations aimed to discredit us as well as significant adversities in all aspects of our lives.

We have already talked to our local FBI office in Detroit but wanted to also get in touch with you and your team.

We understand that thus sounds like an incredible story. We asked the FBI agent we spoke to why would two physician-scientists provide false testimony to the FBI knowing what the penalties are for such false testimony? Answer: They would not. We have extensive documentation including recordings to back our statements. We are asking for you to give us a chance to perform our duties as citizens of this great country and allow us to provide our testimony, under oath, to your committee and share our evidence. We believe that this information can prove instrumental in protecting the electoral process and our democracy.

Sincerely,

Bradley Foerster MD PhD
630 Geddes Ridge Avenue
Ann Arbor, MI 48104
(734) 262-9209, bradleyfoerster05@gmail.com

Myria Petrou MA MB ChB MS
petroumyria75@gmail.com

(734) 709-4679